DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  9/30/2020

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------- x

IN RE: TERM COMMODITIES COTTON FUTURES :
LITIGATION,                                                  :
                                                             :
                                                             :
MARK ALLEN and BRIAN LEDWITH, *individually*    :          **12-CV-5126 (ALC)**
*and on behalf of others similarly situated,*         :
                                                             :
                                   Plaintiff,              :
                                                             :
                          -against-                        :
                                                             :
TERM COMMODITIES, INC., ET AL.,                    :
                                                             :
                                   Defendants.            :
                                                             :
---------------------------------------------------------------- x
                                                             :
                                                             :
ROBERT WALFORD, *individually and on behalf of*  :
*others similarly situated*,                            :          **12-CV-5269 (ALC)**
                                                             :
                                   Plaintiff,              :
                                                             :
                          -against-                        :
                                                             :
TERM COMMODITIES, INC., ET AL.,                    :
                                                             :
                                   Defendants.            :
                                                             :
---------------------------------------------------------------- x
                                                             :
CHRISTOPHER PINKHAM, *individually and on*       :
*behalf of others similarly situated*,                 :
                                                             :          **12-CV-5334 (ALC)**
                                   Plaintiff,              :
                                                             :
                          -against-                        :
                                                             :
TERM COMMODITIES, INC., ET AL.,                    :
                                                             :
                                   Defendants.            :
---------------------------------------------------------------- x

```
                                                    :
WILLIAM MEIERFELD, individually and on behalf of   :
others similarly situated,                          :
                                                    :          12-CV-5380 (ALC)
                                  Plaintiff,        :
                                                    :
                         -against-                  :
                                                    :
TERM COMMODITIES, INC., ET AL.,                     :
                                                    :
                                  Defendants.       :
                                                    :
-------------------------------------------------- x
                                                    :
RAYMOND C. CROSTA, individually and on behalf of   :
others similarly situated,                          :
                                                    :          12-CV-5563 (ALC)
                                  Plaintiff,        :
                                                    :
                         -against-                  :
                                                    :
TERM COMMODITIES, INC., ET AL.,                     :
                                                    :
                                  Defendants.       :
                                                    :
-------------------------------------------------- x
                                                    :
BRIAN LEDWITH and ADAM HARRINGTON,                 :
individually and on behalf of others similarly situated, :
                                                    :          12-CV-5732 (ALC)
                                  Plaintiff,        :
                                                    :          OPINION & ORDER
                         -against-                  :
                                                    :
TERM COMMODITIES, INC., ET AL.,                     :
                                                    :
                                  Defendants.       :
-------------------------------------------------- X
```

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs Mark Allen and Brian Ledwith (collectively, "Plaintiffs") bring this consolidated proposed class action on behalf of themselves and a proposed class of traders who lost money when prices in the cotton futures market increased unexpectedly in 2011. Plaintiffs claim that Defendants, Louis Dreyfus Commodities B.V., Louis Dreyfus Commodities Cotton LLC (a/k/a Allenberg Cotton Company), LDC Holdings Inc., Term Commodities, Inc., Louis Dreyfus Commodities LLC, and Joseph Nicosia (collectively, "Defendants") unlawfully manipulated the price of cotton futures by unreasonably and uneconomically demanding delivery of certificated cotton in fulfillment of futures contracts in conjunction with other manipulative behavior. As a result of Defendants' market conduct, Plaintiffs argue they suffered losses in liquidating their positions in the May and July 2011 Cotton No. 2 futures contracts.

Defendants filed motions in limine to exclude the testimony of two of Plaintiffs' experts, as well as a motion for summary judgment as to Plaintiffs' remaining claims. The Parties filed motions to seal certain of their submissions in connection with the above motions. For the reasons set forth below, the Parties' motions to seal are **GRANTED**, Defendants' motions in limine are **GRANTED** in part and **DENIED** in part, and Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.[1]

---

[1] The Parties collectively submit a number of motions to seal their submissions, including to seal Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment; Defendants' Local Rule 56.1 Statement; Defendants' Memorandum of Law in Support of Their Motion to Exclude the Testimony of Gerald C. Marshall; Defendants' Memorandum of Law in Support of Their Motion to Exclude the Testimony of Dr. Craig Pirrong; the Declaration of William H Wagener and the exhibits thereto. Plaintiffs' submitted motions to seal their responses to these documents. *See* ECF Nos. 554–561. Finally, Defendants' submitted a motion to seal their replies to these documents. *See* ECF No. 569–70. The Court recognizes that there is a strong First Amended presumption of public access to judicial documents and proceedings. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20,123–24 (2d Cir. 2006). However, court

# INTRODUCTION

This dispute concerns a commodity used daily by people across the globe and the use of which dates back to prehistoric times: cotton.  Yet this dispute over a timeless, perhaps mundane, commodity is not one that can be considered in a casual fashion.  Instead, it concerns a complex scheme of alleged market manipulation in the cotton futures market that resulted in hundreds of millions of dollars in losses.

Plaintiffs commenced this action alleging violations of the Commodity Exchange Act, §§ 1 and 2 of the Sherman Act, and for unjust enrichment.  At the motion to dismiss stage, this Court dismissed Plaintiffs' unjust enrichment claim and their claim under §1 of the Sherman Act.  This left three claims: market manipulation claims pursuant to the Commodity Exchange Act; aiding and abetting claims pursuant to the Commodity Exchange Act; and antitrust claims pursuant to §2 of the Sherman Act.  For the reasons set forth below, the Court concludes that Plaintiffs have alleged enough facts and evidence that a reasonable jury could render a verdict in Plaintiffs' favor on each of these claims.  Specifically, Plaintiffs have sufficiently alleged that Defendants had the ability to influence prices of cotton futures contracts, that Defendants intended to influence these prices, and that Defendants' actions caused artificial prices in the market.  Plaintiffs also

---

documents may be sealed if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13–14 (1986) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984)).  After careful review of the Parties submissions, including their memorandum of law in support of their motions to seal and the Parties' proposed redactions, the Court concludes that the Parties' unopposed motions should be **GRANTED**.  The documents the Parties' wish to seal reference documents and deposition transcripts that have been designated as "Confidential" or "Highly Confidential" by the producing party pursuant to the Protecive Order entered in this case.  The Parties are **ORDERED** to file redacted versions of the documents referenced above on ECF **within 30 days of the filing of this Opinion & Order.**  The Court reserves the right to request additional briefing on whether these documents should remain sealed at a later stage in this litigation.

sufficiently alleged that the corporate Defendants aided and abetted Defendant Nicosia in the manipulative trading scheme described above. Finally, Plaintiffs sufficiently allege that Defendants possessed monopoly power in the cotton futures market for the May and July 2011 contracts, and that Defendants engaged in anticompetitive conduct while maintaining this monopoly power. This is enough to survive summary judgment.

## BACKGROUND

### I. Factual Background

The following factual summary consists of only undisputed material facts ("UMF"), unless otherwise indicated. These facts are, in significant part, copied verbatim from Defendants' Rule 56.1 Statement. Where the facts are subject to legitimate dispute, they are construed in favor of Plaintiffs as the non-moving party. *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005).[2] The Court begins by briefly describing commodities futures trading generally, and the cotton futures market specifically, before turning to the allegations in this case.

### A. Cotton Commodities Futures Trading

#### i. Commodities Future Markets, Generally

---

[2] The Court pauses to note that its review of the record was made considerably more onerous by Parties failure to adhere to Local Civil Rule 56.1, as their statements submitted pursuant to that rule not only "ignore[] the Rule's requirement that a statement be 'short and concise'" but are "not limited to *facts* as to which it is contended that no genuine triable issue exists[,]" instead containing legal arguments and matters that are often redundant of one another and "are clearly disputed in this litigation." *Hailoo v. Disability RMS, First Unum Life Ins. Co.*, No. 14-CV-1992, 2015 WL 7575906, at *23 (E.D.N.Y. Nov. 25, 2015) (quoting *Cotterell v. Gilmore*, 64 F. Supp. 3d 406, 419 (E.D.N.Y. 2014)) (emphasis added).

References to Defendants' Rule 56.1 Statement are presumed to incorporate counterparty responses as well as the documents and deposition testimony cited therein. Unless otherwise indicated, a standalone citation to Defendants' 56.1 Statement represents that this Court has overruled any objections and deemed the underlying factual allegation undisputed.

A futures contract is an agreement between two parties to buy or sell a commodity, such as cotton, at a predetermined price and at a fixed date in the future. UMF ¶37.  Generally, "[a]ll aspects of the contract, such as the quantity, quality, and delivery date, are standardized except for the price. The price is determined by traders in the commodity who negotiate at a commodities exchange." *In re Nat. Gas Commodity Litig. ("Natural Gas I")*, 337 F. Supp. 2d 498, 502 (S.D.N.Y. 2004).  Parties generally do not directly contract with each other, but instead conduct their trading through a commodities exchange.  The party that agrees to buy a commodity has a "long" position, while the party that agrees to sell the commodity has a "short" position. UMF ¶38. If a buyer retains a contract until the delivery date, it is obligated to either take delivery and pay for the commodity or make a cash settlement in accordance with the terms of the contract. Similarly, if a seller retains a contract until the delivery date, it is obligated to deliver the commodity or make a cash settlement. *See* UMF ¶57 ("A cotton futures trader may either physically settle its position (i.e., by making or taking delivery of cotton), or by offsetting its position (i.e., a trade who is long a futures contact selling that same contract, or a trade who is short a futures contract buying that same contract).").

"Only a small percentage of futures transactions actually result in an exchange of money for a commodity." *In re Amaranth Nat. Gas Commodities Litig. ("Amaranth")*, 587 F. Supp. 2d 513, 521 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013).  Instead, "[m]ost investors close out their positions before the delivery dates." *Id.*  Closing out a position by entering into an offsetting contract obviates the need to either make or accept delivery of the physical commodity.  Generally, if the price of a commodity increases, the buyer (i.e., the "long") makes money because it receives the commodity at the earlier-agreed, cheaper price and sells it at the higher market price today. Similarly, if the price of a commodity decreases, the seller (i.e., the "short") makes money because

6

it purchases the commodity at the lower market price today and sells it at the earlier-agreed-upon higher price. "Many futures are 'cash-settled,' meaning that when the contract matures, rather than an actual delivery of a commodity, the party that has lost money on the transaction will pay the other party the appropriate amount." *Amaranth*, 587 F. Supp. 2d at 521 n.19.

The overwhelming majority of traders in the commodities market are either speculators or hedgers. *See Amaranth*, 587 F. Supp. 2d at 521 ("The vast majority of traders in the commodities market are either speculators seeking to profit from price changes but having no independent interest in the underlying commodities or companies that are exposed to the prices of commodities and purchase futures to 'hedge' those risks, that is, to protect against unforeseen price changes."). Hedgers "may be cotton merchants, farmers, textile mills, and other market participants with exposure to cotton prices." UMF ¶41. For hedgers, the future contract can serve as a form of insurance against price fluctuations. "As a simple example, an orange grower may acquire a short position in oranges to protect himself against a decline in orange prices in the event of a bumper crop, while a juice producer may acquire a long position to guard against a price increase in oranges should foul weather destroy the season's orange crop." *Natural Gas I*, 337 F. Supp. 2d at 502. Speculators, on the other hand, place bets on future price moves of a commodity in hopes of earning a profit, but do not have obligations in the market for physical cotton. UMF ¶42.

A few terms of art are necessary to understand the allegations in this case. The "prompt-month" contract is the contract with the next expiration date, and "expiry" (or "last trading day") is the date by which all participants must either physically settle or offset their positions. UMF ¶¶ 54, 58. "Contango" (or "carrying charge") refers to the market condition where the price for prompt-month cotton is lower than for later month contracts. UMF ¶55. "Backwardation" (or "inversion"), on the other hand, refers to the market condition where the price for prompt-month

cotton is higher than prices for later contracts. "Rolling" is a trading strategy where traders shift their positions from one futures contract to another contract month. UMF ¶59. Positions can be rolled "out" from a prompt-month into a deferred month, or (much less frequently) they can be rolled "forward" from a deferred month into a prompt-month. UMF ¶59. The "notice period" is the period during which shorts announce their intention to deliver cotton, the "first notice day" ("FND") is the first day when the holder of a short position may issue a delivery notice to the holder of a long position, the "last notice day" is the last day of the notice period, and the "last trading day" is the day on which trading ends. UMF ¶66, 72, 75. "Open interest" is the number of futures contracts in a delivery month that have not yet been liquidated or closed by physical delivery or an offsetting transaction. UMF ¶83. Shorts who have not offset their positions by the end of the last trading day must deliver the physical commodity to satisfy their contractual obligations. UMF ¶76. Finally, during physical delivery of a commodity, the short "issues" a delivery notice and the long receives (or "stops") the delivery notice. UMF ¶62.

ii.   Cotton Futures Market

Cotton is sold in both cash markets and in the futures market. UMF ¶29. Physical cotton may be sold for immediate delivery in the "spot" market, at a "spot" or "cash price. UMF ¶36. The cotton futures contracts at issue in this case, "ICE Cotton No. 2," are traded exclusively on the Intercontinental Exchange ("ICE" or "Exchange"). UMF ¶45. Under the Commodities Exchange Act ("CEA"), ICE Futures U.S., a subsidiary of ICE, is a "Designated Contract Market" that has the authority to "prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process." 7 U.S.C. § 7(d)(4); UMF ¶47–48. The Commodity Futures Trading Commission ("CFTC") is the oversight regulating authority for ICE. UMF ¶49.

Under a Cotton No. 2 futures contract, the short agrees to deliver 100 bales (approximately 50,000 pounds) of cotton and the long agrees to accept delivery, at a predetermined price and at a predetermined future date. UMF ¶51.  The cotton traded pursuant to a Cotton No. 2 futures contract must meet delivery and quality standards set by ICE. UMF ¶52.  ICE designates five dates throughout the year when futures contracts expire—in March, May, July, October, and December. UMF ¶53.  The relevant dates for the May 2011 and July 2011 ICE Cotton No. 2 futures contracts at issue in this case are:

| Contract | First Notice Day | First Delivery Day | Last Trading Day | Last Notice Day | Last Delivery Day |
|---|---|---|---|---|---|
| **May 2011** | April 25, 2011 | May 2, 2011 | May 6, 2011 | May 13, 2011 | May 20, 2011 |
| **July 2011** | June 24, 2011 | July 1, 2011 | July 7, 2011 | July 14, 2011 | July 21, 2011 |

UMF ¶¶66–81.  Cotton may be stored in warehouses (or other locations such as "gin yards") or may be "in transit." UMF ¶88.  Some warehouses are licensed by ICE to store "certificated" cotton. UMF ¶89.  "ICE warehouses" are warehouses that are licensed by ICE to receive physical deliveries of cotton. UMF ¶90.  ICE rules dictate the standards for the grade, staple, and value of all cotton delivered pursuant to a contract within its market.  To be deliverable on the ICE Cotton No. 2 futures contract, cotton must be "certificated" by the USDA at an ICE warehouse.  "Certification" is the process by which cotton stored in ICE-approved warehouses is graded by the USDA.  The process involves multiple steps including sending samples of the cotton to the USDA and having those samples classed and the information recorded in a national database. UMF ¶91, 93.  ICE warehouses can hold either "certificated" or "uncertificated" cotton. UMF ¶92.  A short can settle a futures position by delivering title to certificated cotton. UMF ¶93.  If an owner wants to take physical possession of the cotton, ICE and non-ICE warehouses must load out (i.e., ship) within a certain minimum time period of receiving a load out order.  During the relevant time period, ICE warehouses were required to load out cotton within nine weeks of received a load out

9

order. UMF ¶96.[3]  Non-ICE cotton warehouses are required to load out at least 4.5% of their storage capacity per week (assuming there are sufficient requests for load out to meet this threshold) and "without unnecessary delay." UMF ¶98.

Cotton stored at non-ICE-approved facilities, once extracted, is transported to an ICE-approved warehouse.  When the cotton arrives at an ICE warehouse, it must be certificated by the United States Department of Agriculture ("USDA") before it is deliverable against an ICE cotton futures contract. UMF ¶93.  There is a regular certification process and a delayed certification process.  Under the delayed certification process, cotton can be certificated by taking samples and sending them to the USDA for receipt by 8pm at least two days prior to the Last Delivery Date. UMF ¶94.  The Parties dispute the length of time for the certification process, but the range is anywhere from several days to several weeks. UMF ¶95.  Delayed certification is not the preferred method of delivery because if bales do not pass USDA classing, the short defaults and has to pay a penalty of 4 cents per pound (about $2,000 per contract). UMF ¶406.

    iii.    "Squeezing" the Market

Plaintiffs allege a form of market manipulation known as market "squeezing."  For context, the Court briefly describes how a "squeeze" operates.  A squeeze is "a condition in maturing futures where sellers (hedgers or speculators), having waited too long to close their trades, find there are no new sellers from whom they can buy, deliverable stocks are low, and it is too late to produce the actual commodity elsewhere to settle by delivery. Under such circumstances and

---

[3] This loadout requirement is from the ICE Futures U.S., Inc., Cotton No. 2 Rules, Rule 10. Specifically, the Rule states that "[a]ll warehouses are required to load-out cotton within nine (9) weeks from the date of receipts of a valid load-out order." *Id*. at 10–34.  Plaintiffs note that this rule was effective April 24, 2009 but was amended in December 2, 2016.  Neither party presents evidence that the rule was materially amended in 2016 or that the requirement was different during the 2010-2011 crop year.

though the market is not cornered in the ordinary sense, traders who are long hold out for an arbitrary price." *In re Term Commodities Cotton Futures Litig. (Cotton I)*, 12-CV-5126, 2013 WL 9815198, at \*3 n.2 (S.D.N.Y. Dec. 20, 2013) (quoting *In re Ind. Farm Bureau Coop. Ass'n ("Indiana Farm")*, [1982–1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796, 1982 WL 30249, at \*7 (CFTC Dec. 17, 1982).   Professor Richard Friedman instructively applies this definition to a hypothetical futures market of stringbeans:

> Now suppose that trader Long controls a large share of the physical supply of stringbeans now available for delivery near the [Fictitious National Stringbean Exchange], and also a large long position in the expiring futures contract. Shortly before expiration of the contract, supplies are very tight, and the price rises sharply. Most other long traders liquidate their positions, providing only slight relief to the shorts, who are now effectively compelled either to satisfy their obligations by delivery or to deal with Long. Long nevertheless declines for an extended period to liquidate his futures position or to sell any of his physical supply; instead, knowing that if he does not liquidate promptly many of the shorts will deliver, he stands for delivery. At last, with prices continuing to soar and expiration of the contract nearing, Long begins to sell futures contracts. Long sells enough contracts at elevated prices so that none of the shorts default. After expiration of the contract, prices fall quickly, and some time afterwards Long sells off much of his remaining supply of physicals. Soon after that, Long is charged with manipulation.

Richard D. Friedman, *Stalking the Squeeze: Understanding Commodities Market Manipulation*, 89 MICH. L. REV. 30, 34 (1990).  Friedman presciently (for reasons discussed later in this opinion) lays out Long's potential response to the charges of manipulation: "Long may well deny that he did anything wrong. Indeed, he will likely contend that the shorts were at fault, for failing to move beans into position for delivery. . . . Or he may assert that he had use for the physical beans and had wanted to take delivery of them; only a very sharp price rise changed his plans, and in doing so he was rather graciously letting the shorts off the hook." *Id.*

    iv.    ICE Oversight

ICE is a designated contract market regulated by the CFTC and has the authority to "prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process

through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C §
7(d)(4). The CFTC requires all exchanges have a market surveillance department to monitor
activity and large trade positions in the contracts traded on that exchange, and ICE has such a
market surveillance department. UMF ¶¶ 106–07.

ICE establishes position limits that traders may take in the ICE Cotton No. 2 futures market.
UMF ¶101. An "all months" limit governs the size of the position a trader may take in the contract
months that are not in the notice period, whereas a "spot month" limit governs the size of the
position a trader may take in the prompt-month futures contract during the notice period. UMF ¶¶
102–03. Absent exemptions, the position limit for Cotton No. 2 futures prior to the notice period
is 5,000 contracts and the position limit during the notice period (i.e., by the first notice day) is
300 contracts. UMF ¶¶ 104–05. ICE may, however, grant exemptions to position limits for bona
fide hedgers and ICE can direct parties to manage their positions. *Id.* at ¶¶108.

Each trading day, ICE publishes the total number of certificated bales of cotton located in
all ICE warehouses, the amount of stocks in ICE-approved warehouses awaiting grading by the
USDA, the futures price, and issue and stop notices. UMF ¶108. ICE does have the authority to
request additional, non-public information from market participants regarding their need for, or
ability to deliver, cotton. UMF ¶112. The Parties dispute, however, whether there is public data
on the amount of non-certificated cotton in ICE warehouses. UMF ¶110.

### B. Alleged Market Manipulation by Defendants

Plaintiffs allege that Defendants intentionally and uneconomically took the largest ratio of
deliveries of physical cotton to the amount of certificated supplies in the history of ICE cotton
futures trading, resulting in contract prices climbing and effectuating a squeeze in the cotton
futures market.

12

i.   **The Parties**

Plaintiff Mark Allen was hired by Glencore Grain B.V. ("Glencore") in 2009. UMF ¶1.

Mr. Allen was the head cotton trader at Glencore during the period from March 2011 through July

2011. UMF ¶2.  Glencore was one of the world's largest commodities firms during the period from

March 2011 through July 2011 but was a relatively small player in the cotton market at the time.

UMF ¶3.  While Mr. Allen was trading futures on behalf of Glencore, he was also trading using

his personal account, and his claims in this case arise from his personal transactions. UMF ¶4–5.

Plaintiff Brian Ledwith was a derivatives trader at Omog Trading during the period from March

2011 through July 2011. UMF ¶7.  Mr. Ledwith traded in both the May and the July 2011 ICE

Cotton No. 2 futures contracts. UMF ¶8.

Defendant Louis Dreyfus Commodities B.V. "trades and markets commodities, including

cotton, on an international basis." Third Consolidated Amended Complaint ("TCAC") (ECF No.

484) at ¶12.  The remaining corporate Defendants are all subsidiaries, affiliates, or clearing

members for Louis Dreyfus Commodities B.V.  Defendant Louis Dreyfus Company Cotton LLC

(known during 2011 as LD Commodities Cotton LLC) (a/k/a Allenberg Cotton Co.) was one of,

if not the, largest cotton merchants in the United States and throughout the world during the

relevant time period from March 2011 through July 2011. UMF ¶24.  Defendant Joseph Nicosia

was Executive Vice President of Louis Dreyfus Commodities LLC and Chief Executive Officer

of Allenberg Cotton Company. UMF ¶25.

ii.   **The Cotton Market for the 2010–2011 Crop Season[4]**

---

[4] A "crop season" for cotton is the time between one year's harvest and the next year's harvest.  It
runs from August 1 of one year to July 31 of the next year. UMF ¶33–34.  Accordingly, the 2010–
2011 crop season ran from August 1, 2010 to July 31, 2011.

Though the Parties dispute the relevance of developments in the global cotton market in 2010, *see, e.g.*, UMF ¶114, the Court briefly outlines the state of the market to the extent it is relevant to understanding the Parties' arguments.  For a number of domestic and global reasons— including flooding in Pakistan, India's ban on cotton exports, and consumer demand for apparel— prices and the volatility of cotton reached highs in the Fall of 2010 because of significant demand and low supply. UMF ¶114, 116–17, 267.  As of May 2011, there were 6,446,000 bales of cotton in the United States and as of July 2011 there were 3,743,000 bales. UMF ¶¶127–28.[5]  During the entire 2010–2011 crop season, the New York futures front month traded at an inversion to the second month in all but eight of the 252 trading sessions. UMF ¶129.

### iii.  Defendants' Cotton Positions for the May 2011 and July 2011 Contracts

On November 24, 2010, Defendants applied to ICE for an all-months hedge exemption. UMF ¶132.  Plaintiffs dispute whether Defendants violated the terms of the hedge exemption by not engaging in "bona fide hedging transactions and positions." *Id*; *see* 17 C.F.R. §1.3 *et seq.* (2010) (2011).  Defendants indicated to ICE that they were "merchandising in excess of 9,000,000 bales of cotton per year" and that they had outstanding sales exceeding 3.5 million bales of cotton. UMF ¶¶133–34.  They requested a net long position of up to 70,000 contracts (i.e., 7 million bales) in any one month and a net overall long position limit of 85,000 contracts (i.e., 8.5 million bales). UMF ¶135.  ICE granted Defendants the position limit exemptions they requested with the stipulation that at no time should Defendants' positions exceed their bona fide hedging needs (i.e, that their positions should be "economically appropriate to the reduction of risks in the conduct and management of a commercial enterprise," 17 C.F.R. § 1.3 *et seq.* (2010) (2011)). UMF ¶136.

---

[5] As discussed in detail below, this number was not the deliverable supply of cotton for either the May or July futures contract, because it also included cotton that was outside of warehouses (e.g., at mills or ginnings). *Id.*

Defendants did not exceed the all-months hedge exemption granted by ICE, though Plaintiffs claim that Defendants violated the terms of the hedge exemption because Defendants' positions exceeded their bona fide hedging needs. UMF ¶137.

On April 15, 2011, Defendants applied for a notice period hedge exemption for the May Contract, requesting a long position limit of 11,506 contracts and stated that they had over 2.3 million bales of unfulfilled cotton sales due for delivery through September 2011. UMF ¶¶141–142.  Plaintiffs contend that records produced by Defendants show holdings of "available stock" in their inventory that were far in excess of the amounts represented to ICE. UMF ¶138.  Leading up to the First Notice Day for the May 2011 Contract (i.e., April 25, 2011), ICE and Defendants communicated about Defendants' position. UMF ¶143.  By April 13, 2011, Defendants established their peak long position of approximately 3.1 million bales (30,032 futures contracts) in the May Contract. UMG ¶145.  On April 14, 2011, ICE instructed Defendants not to increase their long position in the May Contract beyond their long position as of the close of business on that date. UMF ¶146.  On April 15, 2011, Defendants requested a notice period position limit exemption from ICE of 11,506 contracts, because they would otherwise have to reduce their long position to 30,000 bales (300 futures contracts) by the First Notice Day (since the position limit for Cotton No. 2 futures during the notice period is 300 contracts).  On April 20, 2011, ICE granted an exemption of 10,000 long contracts with a stipulation that Defendants reduce their position to 600,000 bales by April 27, 2011. UMF ¶150.  Defendants provided an update via email to ICE on April 26, 2011. UMF ¶151.  On April 26, 2011, ICE required Defendants to reduce their position further to 350,000 bales by the close of business on May 3, 2011. UMF ¶152.  Defendants ultimately took delivery of 389,800 bales of the May Contract. UMF ¶154.

On June 17, 2011, Defendants applied for a notice period hedge exemption for the July Contract, requesting a long position limit of 14,000 contracts and stating that they had over 1.47 million bales of unfilled cotton sales due for delivery through October 2011. UMF ¶¶209–10.  As of June 20, 2011, Defendants held a long futures position of approximately 1.17 million bales in the July Contract. UMF ¶211.  On June 21, 2011, ICE granted Defendants an exemption equivalent to 9,000 contracts. UMF ¶212.  Defendants ultimately took delivery of 161,300 bales on the July Contract. UMF ¶214.

### iv.   **Alleged Market Manipulation**

The Court assumes the Parties' familiarity with Plaintiffs' allegations.  For a detailed recitation of these allegations, *see Cotton I*, 2013 WL 9815198, at *3–7.  The Court provides a brief overview of the allegations and relevant facts here, though many of the factual disputes between the Parties—e.g., about the deliverable supply, logistical delays, and backwardation—are discussed in detail in the Opinion.  This recitation is solely for background purposes.  The alleged scheme is largely disputed by Defendants.  Though the Court cites to Plaintiffs' additional material facts in this section, the Court does not deem these facts undisputed and does not overrule any of Defendants' objections in this section.

The crux of Plaintiffs' allegations is that Defendants intentionally and uneconomically took the largest ratio of deliveries of physical cotton to the amount of certificated supplies in the history of ICE cotton futures trading, which exacerbated existing market congestion and caused the contract prices to climb—i.e., Defendants "squeezed" the market.  As part of this alleged scheme, Defendants acted uneconomically by (1) failing to re-tender cotton, which further depleted deliverable supplies and further inflated prices, TCAC at ¶42; (2) decertificating all of the cotton they received delivery on in the May 2011 Contract, *id.*; and (3) refusing cheaper cotton from the

16

cash market, *id.* ¶¶61.  The culmination of this uneconomic activity was that the deliverable supply was too low to satisfy Defendants' positions through delivery, which resulted in shorts having to liquidate their positions at prices greater than what physical cotton could be sold for in the cash market. *Id.* ¶¶ 51, 61(e).

According to Plaintiffs, Defendants knew that lengthy warehouse loadout delays would impact market participants who sought to purchase cotton stored in cash market warehouses for delivery to ICE warehouses to satisfy May 2011 cotton futures contracts. UMF ¶280.  Indeed, Plaintiffs allege that Defendants themselves claimed that "we are only able to find very limited amounts of cotton in the cash market" in their request to ICE for a notice period exemption for the March 2011 Contract. UMF ¶¶ 273, 283.  Accordingly, Defendants knew that it would be difficult to make a large number of deliveries on the May 2011 Contract, and thus that a large stopper in the May 2011 Contract could increase the inversion between the May Contract price and the July Contract price. UMF ¶287.

Plaintiffs allege that Defendants manipulated the market by making large additions to their May Contract long positions and July Contract short positions to hold an approximately balanced bull spread position. UMF ¶295.[6]  These additions peaked with a 3,093,200 bale long position in the May Contract. UMF ¶296.  Defendants made these purchases when the rest of the long side of the open interest in the May Contracts was, on the other hand, generally decreasing their long positions. UMF ¶298.  This, along with Defendants' slower rate of liquidation, caused their percentage market share of the May Contract long positions to grow from 25.7% on March 30 to

---

[6] A "bull spread position" is a position in which the earlier expiring futures contract is a long position and the later expiring contract is a short position.  For example, a market participant who holds a long position in the May 2011 Contract and a short position in the July 2011 Contract has a bull spread position. UMF ¶264.

99.4% on April 25. UMF ¶299.  As Defendants' percentage market share of the open interest in the May Contract increased to the point where Defendants held more than 99% of the long open interest, the spread between the price of the May Contract and the price of the July Contract generally tended to increase as well. UMF ¶300.  Defendants' large late buying deprived the shorts of liquidity to exit the positions at market balanced prices. UMF ¶334.  During the delivery period for the May Contract, Defendants took 99%+ of the deliveries made on the May Contract. UMF ¶348.  Plaintiffs allege that Defendants made approximately $55.1 million in trading profits from March 30 to May 6, 2011 as a result of Defendants' spread position that was long the May 2011 Contract and short the July 2011 Contract. UMF ¶350.

Plaintiffs allege that Defendants' conduct during the July 2011 contract was substantially similar to their conduct during the May 2011 contract.  Between May 23 and June 20, Defendants were net buyers of 1,797,700 bales of July Contracts. UMF ¶407.  Between June 6 and June 20, Defendants were net buyers of 1,054,200 bales of July contracts. UMF ¶408.  Defendants' share of the long open interest in the July Contract increased from -.10 percent on June 3 to 72.19 percent on June 24, 2011. UMF ¶409.  Plaintiffs allege that Defendants' large late buying deprived shorts of liquidity to exit/buy out of the contract. ¶415.  Between June 3 and June 24, 2011, the inversion between the July Contract price and the October Contract price increased from 14.03 cents per pound to 38.3 cents per pound. UMF ¶416.  Finally, between June 14 and July 5, the July Contract price was much higher than the cash market price, but on July 6 and 7, the July Contract price crashed by approximately 20 cents per pound. UMF ¶¶ 423–24.

## II.   **Procedural Background**

Plaintiff Mark Allen filed a class action complaint on June 29, 2012 against Defendants captioned *Allen v. Term Commodities*, No. 12-CV-5126.  Plaintiffs Walford (No. 12-CV-5269),

Pinkham (No. 12-CV-5334), Meierfeld (No. 12-CV-5380), Satullo (No. 12-CV-5470), Crosta (No. 12-CV-5563), and Ledwith (No. 12-CV-5732) filed additional actions, making substantially identical factual allegations, claims, and legal arguments to those in the *Allen* Complaint against the same Defendants on behalf of substantially similar putative classes.  On August 13, 2012 and April 2, 2013, this Court consolidated the above-referenced cases into *In re Term Commodities Cotton Futures Litigation*, Master Docket No. 12-CV-5216.

Defendants filed a motion to dismiss Plaintiffs' Consolidated Amended complaint and the Court heard oral arguments from the parties on May 20, 2013.  At the close of oral arguments, Plaintiffs' counsel indicated Plaintiffs had additional facts to support their claims and would like to file a Second Amended Complaint.  After receiving an offer of proof regarding the additional factual allegations, the Court granted Plaintiffs leave to amend the operative Complaint.  Plaintiffs filed the SCAC on June 10, 2013. ECF No. 65.  The SCAC included four causes of action: (1) manipulation of the cotton futures market in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§9, 13(a), 13b, and 25(a) (2013); (2) Defendants willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by other Defendants; (3) antitrust violations under the Sherman Act, 15 U.S.C. §§1, 2 (2013); and (4) unjust enrichment.  Defendants filed a motion to dismiss Plaintiffs SCAC and on December 20, 2013, this Court issued a Memorandum & Order granting in-part and denying in-part Defendants' motion to dismiss. ECF No. 80.  Specifically, the Court dismissed Plaintiffs' unjust enrichment claims but concluded that Plaintiffs set forth facts in the SCAC that, when taken as true and drawing all reasonable inferences in their favor, stated CEA manipulation claims, CEA aiding and abetting claims, and Sherman Act antitrust claims.  On reconsideration, the Court also dismissed Plaintiffs' third cause of action for violation of §1 of the Sherman Act. ECF No. 111.

Much of 2013 through 2016 was occupied by lengthy and comprehensive discovery. On October 30, 2016, one of the two original named Plaintiffs, Stuart Satullo, moved to withdraw from the action. ECF No. 361. On November 3, 2016, the Court granted the Motion. ECF No. 370. On March 8, 2017, the remaining named Plaintiff, Mark Allen, moved to amend the SCAC. ECF No. 429. On February 28, 2018, United States Magistrate Judge Kevin Fox granted Allen's Motion to Amend. ECF No. 474. Plaintiffs filed their Third Consolidated Amended Complaint on March 16, 2018. ECF No. 484. On May 29, 2018, Defendants requested leave to file a motion for partial judgment on the pleadings seeking to dismiss Plaintiffs' claims with respect to the July 2011 Contract. ECF No. 496. Defendants were granted leave to file this motion and filed it on July 13, 2018. ECF No. 506. Plaintiffs opposed Defendants' motion on August 10, 2018. ECF No. 508. Finally, Defendants replied to Plaintiffs' opposition on August 24, 2018. ECF No. 510. On March 22, 2019, the Court denied Defendants' motion for partial judgment on the pleadings because it concluded that Plaintiff Ledwith had sufficiently alleged violations of the CEA regarding the July 2011 Contract. ECF No. 518.

Finally, Defendants filed the instant motion for summary judgment on November 18, 2019. ECF No. 533, along with a motion to seal certain of their submissions, ECF No. 531, a motion in limine to exclude the testimony of Gerald C. Marshall, ECF No. 534, and a motion in limine to exclude the testimony of Dr. Craig Pirrong, ECF No. 535. Plaintiffs filed their oppositions to these motions on February 17, 18, 21, and 24, 2020. ECF Nos. 544–51, 554–66. Defendants replied on April 2, 2020. ECF Nos. 569–74.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and "the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City*

*Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting A*nderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a).  Material facts are facts that may affect the outcome of the case. *Anderson*, 477 U.S. at 248.  An issue of fact is "genuine" when a reasonable fact finder can render a verdict in the nonmoving party's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotation marks omitted).  "[T]he court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986).

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) (quoting *Marvel Characters v. Simon*, 310 F.3d 280, 285–86 (2d Cir. 2002)).  If the moving party meets its burden, the burden shifts to the non-moving party to bring forward "specific facts showing a genuine issue for trial." *Gen. Ins. Co. of Am. v. Starr Indem. & Liab. Co.*, No. 14-CV-7354, 2016 WL 4120635, at *4 (S.D.N.Y. July 22, 2016) (citation omitted); *see also* Fed. R. Civ. P. 56(c).  The non-moving party "may not rest upon mere allegation[s] or denials of his pleadings," *Anderson*, 477 U.S. at 259.  Rather, the non-moving party must "designate specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), and these facts must be "admissible in evidence." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (quoting Fed. R. Civ. P. 56(e)).  "The mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment," *Anderson*, 477 U.S. at 247

(emphasis in original), and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 50 (internal citations omitted).

## DISCUSSION

### I.    Motions in Limine[7]

The Court first addresses Defendants' two motions in limine to exclude the expert testimony of Gerald C. Marshall and Dr. Craig Pirrong.  For the reasons set forth below, the Court grants, in part, Defendants' motions.

### A.  Legal Standard

Admitting expert testimony is a three-step process governed by Federal Rules of Evidence ("FRE") 702 and 403—a court must conclude that (1) a witness is "qualified as an expert;" (2) the witness's testimony is based on reliable data and methodology; and (3) the testimony will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  Expert testimony may also be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* (quoting FED. R. EVID. 403).  FRE 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

---

[7] "The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir.1996) (internal quotation marks and citation omitted).  "A court's ruling regarding a motion in limine is necessarily preliminary—and is subject to change when the case unfolds. A foundation may be laid contrary to expectations; relevance may appear where previously considered unlikely; the balancing of factors under Rule 403 may change as events in the courtroom drama unfold." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 676 (S.D.N.Y. 2013).  As such, the Court reserves the right to reconsider its decisions on admissibility as this case progresses.

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," and district courts enjoy broad discretion to admit expert testimony. *Nimely*, 414 F.3d at 395.  There is "a presumption of admissibility of expert evidence and 'the rejection of expert testimony is the exception rather than the rule.'" *Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, No. 11-CV-1237, 2014 WL 1468118, at *6 (S.D.N.Y. Apr. 15, 2014) (quoting FRE 702 advisory committee's note) (internal citation omitted).  However, "[t]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied," *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 n.10 (1993)), and "the district court is the ultimate 'gatekeeper.'" *Id.*

The court must first determine "whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education.'" *Nimely*, 414 F.3d at 395 n.11 (quoting FRE 702).  This is an important inquiry because experts are "permitted substantially more leeway than 'lay witnesses in testifying as to opinions that are not rationally based on [their] perception." *Nimely*, 414 F.3d at 395 n.11 (quoting *United States v. Garcia*, 291 F.3d 127, 139 & n.8 (2d Cir. 2002)).  If an expert is qualified within the meaning of Rule 702, then the Court must turn to "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 597).

"In assessing reliability, 'the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.'" *Williams*, 506 F.3d at 160

(quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).  This list of criteria is not exhaustive, *see Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004), and courts may also look to whether a theory or technique has been or can be tested; whether the theory or technique has been subjected to peer review and publication; the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Williams*, 506 F.3d at 160 (citing *Daubert*, 509 U.S. at 593–94).  Even for nonscientific evidence, "Rule [702] as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful." FED. R. EVID. 702 advisory committee note; *See also In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 593 F.Supp.2d 549, 556 (S.D.N.Y. 2008) ("In *Kumho Tire Company v. Carmichael*, the Supreme Court held that Rule 702 imposed a basic gatekeeping obligation upon a trial judge when considering *any* expert testimony regardless of whether it involved scientific testimony.").

Finally, the court must inquire into whether the expert's testimony will "assist the trier of fact,"—i.e., whether the testimony is relevant. *Nimely*, 414 F.3d at 397 (citing Fed. R. Evid. 702). "We have consistently held . . . that expert testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it,' by definition does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's,'" *Id.* (citations omitted).

As noted above, in addition to the three requirements of Rule 702, expert testimony is also subject to FRE 403.  This rule provides that testimony "may be excluded if its probative value is

24

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." FED. R. EVID. 403.

### B.  Testimony of Gerald C. Marshall

Gerald Marshall was asked by Plaintiffs to give his opinion of "Defendants' actions during March through July 2011 as a cotton merchant, including its ICE futures trading, its treatment of offers to sell back cotton when those offers were made at very attractive levels related to ICE futures prices, its novated pre-existing export sales, and its representations to ICE." *See* Expert Report of Gerald C. Marshall ("Marshall Report"), Exhibit 8 at ¶2.[8]  Defendants do not contest that Mr. Marshall is sufficiently qualified as an expert.  From 1978 until 2007, Marshall worked in the cotton merchandising business for Cargill, Inc. and various of its subsidiaries and divisions, trading in the United States, Latin America, Central Asia, India, Pakistan, China, and Australia. *See* Marshall Report at ¶1.  Mr. Marshall served as a Senior VP and merchandising manager at Cargill and managed overall cash and futures trading of cotton, including hedging. *Id.*  Rule 702 provides that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." FRE 702.  Courts in this Circuit liberally construe these requirements. *See United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule").  The Parties do not dispute, and the Court agrees, that Mr. Marshall is qualified to serve as an expert.

Defendants object to five of Mr. Marshall's opinions: (1) his opinion that Defendants' trading was not "hedging;" (2) his opinion that Defendants' conduct reflected market conduct usually used in a corner, trap, or squeeze; (3) his opinion that Defendants' reporting pursuant to

---

[8] When the Court references a particular exhibit, it is referring to the exhibits attached to the Declaration of William H. Wagener (ECF No. 532) unless otherwise noted.

USDA regulations could be misleading; (4) his opinion that Defendants statements to ICE could be misleading; and (5) his testimony regarding what Defendants allege is "Defendants' knowledge, intent, and state of mind." *See* Defendants' Memorandum of Law in Support of Motion to Exclude the Testimony of Gerald C. Marshall (ECF No. 534) ("Motion to Exclude Marshall") at 1–2. Defendants object to the first three opinions because they allege these opinions are inadmissible "testimony encompassing an ultimate legal conclusion." *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991). Defendants object to the fourth opinion because they allege it impermissibly "usurp[s] . . . the role of the jury in applying the law to the facts before it." *Id.* at 1294. Finally, Defendants object to the fifth opinion because they allege it is improper testimony regarding Defendants' state of mind. *Id.*

The Federal Rules of Evidence have a presumption of admissibility—evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" is "generally admissible." FED. R. EVID. 401, 402. This presumption, however, is subject to a well-established exception that witnesses "may not present testimony in the form of legal conclusions." *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010) (citation and quotation marks omitted); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."). This exception exists because testimony that encompasses an ultimate legal conclusion "undertakes to tell the jury what result to reach, and thus attempts to substitute the [witness's] judgment for the jury's" *Id.* (citing *Nimely*, 414 F.3d at 397). Courts must "distinguish between factual conclusions that may be included in an expert's testimony— though they embrace an ultimate issue to be decided by the jury—and opinions embodying legal

conclusions that encroach upon the court's duty to instruct on the law." *Bilzerian*, 926 F.2d at 1294.

*First*, Marshall testifies that Defendants trading behavior—e.g., Defendants changing their futures positions drastically when there was little net cash market activity that required additional hedging—"was, in my opinion, speculation, not hedging." Marshall Report at ¶15.  This opinion does not embrace an ultimate legal issue, but instead provides expert commentary on a factual issue. *See In re Ashanti Goldfields Securities Litig.*, 184 F. Supp. 2d 247, 260 (E.D.N.Y. 2002) ("Indeed, at least in the context of taxation, courts have held that the determination of whether futures activity is hedging or speculation is a factual issue, not a legal one."); *see also Sharette v. Credit Suisse Intern.*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015) ("[W]hether Plaintiffs' contentions as to the meaning of the term 'hedging' are correct is also a question of fact to be adjudicated by the fact finder.").  Here, Mr. Marshall is not testifying that Defendants' conduct was not a "bona fide hedging transaction" within the definition of CFTC regulations; but instead he is commenting on whether Defendants' market actions resemble those of a hedger or speculator.  Such expert commentary is admissible.

*Second*, Marshall testifies that the "short traders were quickly caught in a trap" because Defendants were "holding a progressively larger share of the May longs as time passed," Marshall Report ¶24, and that Defendants, "by buying in huge size the May 2011 contract and, later, the July 2011 contract, during and after the index roll and options expiration in each case, exacerbated the already-existing severe market congestion." Rebuttal Report of Gerald C. Marshall, Exhibit 10 at ¶4(a).  These opinions are also not "impermissible legal conclusions."  Instead, as above, they are market observations where Marshall applies his experience in cotton futures trading to opine on how Defendants' market behavior impacted the positions of other traders and the market

generally.  Marshall does not testify as to whether Defendants' conduct violates the CEA, but instead testifies to the effect of Defendants' conduct on the market and whether that effect was, in his view, normal. *See Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) ("The expert, for example, may tell the jury whether he thinks the method of trading was normal, but not, in our view, whether it amounted to illegal manipulation under Section 9 of the Securities Exchange Act of 1934."); *see also In re Blech Securities Litig.*, No. 94-CV-7696, 2003 WL 1610775, at *23 (S.D.N.Y. Mar. 26, 2003) ("[Experts], therefore, cannot simply state that [they] know[] the market was manipulated. [They] can, however, point to factors indicating . . . that market manipulation occurred, testify as to [Defendants'] practices, and provide [their] reasoning as to why [they] believe[] they were manipulative.").

*Third*, Marshall testifies that Defendants "greatly masked and reduced the extent of demand destruction reflected in the USDA export reports" by reporting export contracts for sales that had been made earlier. Marshall Report ¶¶44–46.  Defendants object in part because Marshall cites the USDA regulations for reporting of export contracts.  However, Marshall does not state in his testimony that Defendants ran afoul of these regulations.  Instead, Marshal simply notes that the way in which Defendants reported "did not remotely reflect the degree of demand destruction that was, in fact, ongoing." *Id.* ¶47.  His opinions on reporting export sales activity are based on his experience and he comments on "the practice under the regulation." *Id.* ¶51.  He opinion does not, as Defendants allege, interpret federal regulations or postulate about the ultimate legal conclusion; instead he cites the regulations to explain his experience with reporting pursuant to these regulations. *Id.*¶¶ 45, 51.  Moreover, the federal regulation at issue—i.e., USDA regulations—is not a basis for liability in this case. *See In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009) ("The Court disagrees with Merck that expert testimony about FDA

regulations and procedures would usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it. This principle is invoked to exclude expert testimony about the applicable law that governs the case.") (citation and quotation marks omitted).

*Fourth*, Marshall testifies that Defendants' statements to ICE were "contrary to facts and misleading." Marshall Report at ¶26, 27–31.  This testimony is based on his "experience and review of the materials in this case," *id.* at ¶26, and Marshall dedicates pages of his report to explaining why Defendants' statements were potentially misleading in light of the shipping window under ICE rules, the price of ICE cotton futures, cotton demand globally, and other market conditions. *Id.* ¶¶30–32.  This is not, as Defendants allege, an *ipse dixit* opinion outside the scope of Marshall's expertise.  Marshall does not testify that ICE was actually misled or that Defendants made the statements for the purpose of misleading ICE.  Instead, his testimony would "assist the trier of fact" because it describes how and why Defendants' statements were "contrary to fact" and thus "misleading" given the cotton market generally and conditions during the alleged time period. *Nimely*, 414 F.3d at 397 (citing Fed. R. Evid. 702).  It is difficult to ascertain, from the record alone and without expertise in the cotton commodities futures market, why Defendants' statements to ICE may be misleading.  Defendants are free to allege that their statements were not misleading. However, Plaintiffs' expert is permitted to synthesize the record and explain the market conditions and industry standards that made Defendants' statements allegedly misleading.

*Fifth*, and finally, Marshall testifies that Defendants "knew well in advance . . . that there was a possibility the export sales cancellations and switches to polyester . . . might result in diminishing warehouse delays in coming weeks and months," *id.* at ¶28; that Defendants had "strong reasons to expect that the shorts would be incapable of creating any significant quantity of

cert stock," *id.* at ¶29; and that he "personally believe [Defendants'] motivation for the activity was to squeeze front-month shorts." Expert Response Report of Gerald C. Marshall, Exhibit 9 at ¶11. Defendants contend that this testimony, along with other similar testimony, impermissibly opines on Defendants' state of mind. Marshall cannot testify to Defendants' state of mind when they made certain business decisions. *See LaSalle Bank Nat. Ass'n v. CIBC Inc.*, 08-CV-8426, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) ("[A]n expert may not testify as to facts not within his personal knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses.") (citation omitted); *see also In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."). However, while "[e]xperts are not permitted to testify to an actor's state of mind, [] an expert can testify to whether a given practice is consistent with a given state of mind." *U.S. Commodity Futures Trading Commn. v. Wilson*, 13-CV-7884, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016). Analogously, an expert can testify to whether a given state of mind is consistent with a given practice—i.e., a defendant likely knows X if they do Y. Marshall's testimony about Defendants' knowledge in light of their actions—e.g., that Defendants knew the possibility that there may be diminishing warehouse delays; that Defendants knew the March exports were materially inflated; that Defendants knew of the logistical obstacles to increasing their positions at a late date—are admissible. However, Marshall's testimony as to Defendants' motivation—i.e., that he "personally believes [Defendants'] motivation for the activity was to squeeze front-month shorts"—will be excluded as impermissible expert testimony on Defendants' state of mind.

To the extent any of Mr. Marshall's expert report not objected to by Defendants includes testimony stating an ultimate legal conclusion or impermissibly testifying about Defendants'

mental state, the Court will not consider that testimony.  However, since Mr. Marshall's testimony is almost entirely admissible, the Court will not "throw the good out with the bad." *In re Pfizer Inc. Securities Litig.*, 819 F.3d 642, 665 (2d Cir. 2016).

### C.  Testimony of Dr. Craig Pirrong

Dr. Craig Pirrong provides expert testimony on three fundamental issues: (1) a "deliverable supply" analysis demonstrating Defendants' ability to influence the prices of the May and July Contracts; (2) event studies demonstrating that the prices of the May and July contracts were artificially high; and (3) a causation analysis demonstrating that Defendants caused the artificially high prices.  Defendants contest Dr. Pirrong's testimony on each of these issues. *See* Defendants' Memorandum of Law in Support of Motion to Exclude the Testimony of Dr. Craig Pirrong (ECF No. 535) ("Motion to Exclude Pirrong").

Dr. Pirrong is a Professor of Finance and Director of the Global Energy Management Institute at the Bauer College of Business of the University of Houston. *See* Amended Expert Report of Dr. Craig Pirrong ("Pirrong Report"), Exhibit 14; Exhibit A at ¶1.  He received his undergraduate degree, a Master's degree, and a PhD from the University of Chicago.  Prior to joining the University of Houston faculty, he was the Watson Family Professor of Commodity and Financial Risk Management at Oklahoma State University, and he has taught at Washington University, the University of Chicago, and the University of Michigan. *Id.*  He has written extensively on issues concerning financial, securities, and futures markets in numerous scholarly journals, and he has served as a peer reviewer for journals including the American Economic Review, the Journal of Finance, the Journal of Law and Economics, and the Journal of Futures Markets. *Id.* at ¶3.  He has served as an expert in many capacities, including as the primary author of a study commission by the Chicago Board of Trade, *id.* at ¶5, as a consultant with commodity

exchanges internationally, *id.* at ¶7, 9–10, as an economic expert for the CFTC in a commodity manipulation case, *id.* at ¶20, and as an expert in various cases related to market manipulation in courts across the country, *id.*  The Court concludes that Dr. Pirrong is qualified to serve as an expert in this case based on his education, experience, skill, and training.

Defendants object to Dr. Pirrong's "deliverable supply" analysis because they allege that the methodologies he uses are either contrary to CFTC precedent and settled caselaw, and/or are based on false assumptions. *See* Motion to Exclude Pirrong at 2–3.  Defendants object to Dr. Pirrong's event studies demonstrating artificially high prices because they allege the studies rely on arbitrary event windows that mirror the class period in the Complaint and because his methodology produces numerous false positives. *Id.* at 3–4.  Defendants object to Dr. Pirrong's causation analysis because he does not test for the relationship between Defendants' positions and either open interest or "artificiality," he does not isolate the price impact of Defendants' alleged misconduct from other factors, and he ignores the impact of ICE's regulation.  Finally, Defendants claim that Dr. Pirrong's report is replete with inadmissible legal conclusions and impermissible testimony on Defendants' knowledge and intent.[9]

_____

[9] Defendants repeatedly cite to Dr. Pirrong's views previously expressed in his articles where he has criticized the CFTC or particular precedents, and also note the fees he has collected and number of reports he has submitted are high. *See, e.g.*, Motion to Exclude Pirrong at 1 ("Dr. Pirrong's practice of offering analyses using his expansive *personal* definition of manipulation has proved lucrative—he has billed plaintiffs' counsel some $1.1 million of fees in this case *alone*, having submitted *nine* reports."); *see also* Def. Reply to Motion to Exclude Pirrong ("Plaintiffs ignore completely that Dr. Pirrong's academic writings—and his approach in this case—are at odds with CFTC precedent.").  These arguments are irrelevant to the Court's analysis.  The fees charged or number of reports written by Dr. Pirrong do not impact the admissibility of his testimony.  Additionally, the Court and the Parties engage in a detailed analysis of the methodology Dr. Pirrong used *in this case*.  That he has previously advocated for changes in CFTC precedent and for expanding liability for commodities manipulation in an academic setting is largely irrelevant as long as his analysis in this case is consistent with the law and factual record and is admissible under FRE 702 and 403.

###### i.    *"Deliverable Supply"* Analysis

Dr. Pirrong's testimony can be separated into two categories: (1) his testimony on cotton inside ICE warehouses and (2) his testimony on cotton outside of ICE warehouses that could be timely certificated and delivered for the May and July 2011 contracts.  Dr. Pirrong testifies that deliverable supply inside ICE warehouses as of the FND for the May 2011 contract was 394,000 bales and for the July 2011 contract was 211,000 bales. Pirrong Report ¶¶106, 400; *see also* Supplemental Expert Report of Dr. Craig Pirrong ("Pirrong Supp. Report") Exhibit 17 at ¶4.[10]  He calculated this supply using the following definition: "the deliverable supply of cotton was the stocks of tenderable quality cotton not committed to sale in ICE warehouses" and not already owned by Defendants. Pirrong Report at ¶¶ 39, 80.  Dr. Pirrong then testified that, although cotton located outside of ICE warehouses is not part of the deliverable supply (because transporting and certification would be uneconomic), the volume of additional bales outside of ICE warehouses that could be timely certificated and delivered was, at most, 366,000 bales for the May 2011 contract and between 119,000 and 227,000 bales for the July 2011 contract. *Id.* at ¶72–74, 162–63, 412–28.[11]

---

[10] Dr. Pirrong's initial analysis estimated that deliverable supply as of the FND for the May 2011 contract was 438,987 bales and for the July 2011 contract was 311,858 bales. Pirrong Report ¶¶106, 400.  However, in his Supplemental Report, he recalculated the deliverable supplies using the methodology from his Initial Report but excluded (1) block bales owned by Defendants and (2) Mallory-Alexander Inventories. Pirrong Supp. Report ¶4.

[11] More specifically, Dr. Pirrong testified that "a total of between 81,000 and 366,000 bales could have moved into deliverable position under delayed certification if shorts had commenced the process on April 6, and between 55,000 and 259,000 bales could have been moved to be delivered under delayed certification had they began on April 15." Pirrong Report ¶162.  Similarly, Dr. Pirrong's estimate for July 2011 is based on the delayed certification process and "if shorts had started the process on June 15." *Id.* ¶422.  Thus, the numbers provided in the Opinion above are the upper bounds of Dr. Pirrong's estimates.

Defendants object to five aspects of Dr. Pirrong's analysis: (1) that he excluded all "committed" cotton from the deliverable supply; (2) that he excluded cotton "in-transit;" (3) that he did not account for Defendants' "prudent planning" obligation; (4) that he incorrectly calculated logistical constraints; and (5) that he excluded cotton from the "Western Region" of the United States. The Court addresses each of these objections in turn and concludes that Dr. Pirrong's testimony on deliverable supply is admissible. Indeed, Defendants largely package their disagreement with Dr. Pirrong's conclusions as deficiencies with the legal sufficiency of his opinions. Many of the issues raised by Defendants are better resolved by the trier of fact and go to the weight given to Dr. Pirrong's opinions rather than their admissibility.

*First*, Defendants object to Dr. Pirrong excluding "committed" bales of cotton from the deliverable supply because they allege this exclusion is contrary to CFTC precedent in *Indiana Farm* and *Cox*. *See* Motion to Exclude Pirrong ("CFTC precedent holds that only '*irrevocably* committed' commodity stocks should be excluded from deliverable supply.") (citing *Indiana Farm*, 1982 WL 30249, at *13) (emphasis in original). Dr. Pirrong explains why he excluded certified cotton committed to outstanding sales contracts from his analysis: "If it is not, it could only be made available for delivery if the owners negotiated to buy back these sales commitments, or acquired other cotton to satisfy these contracts. Because these actions are costly, committed certified cotton should be excluded from deliverable supply. If it is not, then it was more costly to deliver than certified uncommitted cotton." Pirrong Report ¶71. However, despite this statement, in his analysis, Dr. Pirrong did not exclude all bales that were committed under sales contracts. Instead, he used a more conservative estimate: "to be conservative, I consider only bales under shipping order to be committed," *id.* at ¶399, even though "many other bales not under shipping order are also committed for sale," *id.* at ¶102. The CFTC in *Fox* described "irrevocable"

commitments as those that are not "to come due far off into the future." *In re Cox*, 1987 WL 106879, at *5. Plaintiffs argue that because bales under shipping order are not due far off into the future but are instead scheduled to leave the warehouse in which they are stored and thus are "irrevocable" commitments. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion to Exclude Pirrong (ECF No. 564) ("Motion to Exclude Pirrong Opp.") at 7. Defendants, on the other hand, argue that Plaintiffs have not sufficiently demonstrated that cotton under shipping order was "irrevocably committed." *See* Defendant's Reply Memorandum in Further Support of Motion to Exclude Dr. Craig Pirrong (ECF No. 574) ("Motion to Exclude Pirrong Reply") at 5. The Court concludes that Plaintiffs' argument carries the day and that Dr. Pirrong's analysis properly excluded bales under shipping order. Moreover, Defendants are free to provide rebuttal testimony and cross-examine Dr. Pirrong in order to convince a trier of fact that Dr. Pirrong's analysis should be given little or no weight. However, "[t]he methodological flaws alleged . . . go to the weight to be given to the [deliverable supply analyses], not their admissibility." *POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F. Supp. 2d 188, 200 (S.D.N.Y. 2011) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987).

*Second*, Defendants object to Dr. Pirrong's use of EWR data as the starting point for estimating the amount of cotton that shorts could have delivered, because this data excludes "four categories of potentially deliverable cotton: (i) unreceipted inventory in cotton warehouses; (ii) cotton in transit; (iii) cotton on farms; and (iv) cotton in mills." *See* Motion to Exclude Pirrong at 15.[12] Defendants allege that the CFTC has "held that in-transit commodities . . . *are* part of

---

[12] Dr. Pirrong used data produced by EWR, Inc. to estimate the fraction of electronic warehouse receipts ("EWRs") in each state that are not under shipping order. According to Defendants' expert, "[b]y relying on EWR receipts, which only track cotton that is in warehouses, Dr. Pirrong excludes a large portion of the cotton available in the US, including 'unreceipted inventory,'

deliverable supply." *Id.* at 14–15 (citing *Cox*, 1987 WL 106879, at *6).  Defendants, however, simplify the conclusion in *Cox*.  *Cox* did not hold that all in-transit commodities are part of deliverable supply.  Instead, *Cox* included wheat loaded on barges in the deliverable supply because "the dominant short controlled a large supply of out-of-town-wheat, had already loaded it on barges for shipment, could have sent those barges to Chicago, but made a business judgment not to do so." *Cox*, 1987 WL 106879, at *6.  Thus, Dr. Pirrong's testimony using EWR data as the starting point for estimating the amount of cotton that shorts could have delivered is not contrary to law.  That said, Plaintiffs' and Defendants' dueling expert testimony about the feasibility of delivery of in-transit cotton, unrecepted inventory at cotton warehouses, and cotton on farms and mills, is not appropriately resolved at this stage, and does not alter the admissibility of Dr. Pirrong's analysis. *See In re Joint E & S Dist. Asbestos Lit.*, 52 F.3d 1124, 1135 (2d Cir. 1995) ("Trial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts.") (quotation marks and alterations omitted).

*Third*, Defendants object to Dr. Pirrong's analysis because he "ignores that, as a matter of law, shorts must engage in prudent planning." Motion to Exclude Pirrong at 13.  A short is indeed required to plan ahead for delivery. *See Cotton I*, 2013 WL 9815198 at *13 ("[I]t is irresponsible market behavior for shorts to enter the delivery month . . . without making adequate delivery preparations.") (quoting *Cox*, 1987 WL 106879, at *6).  Plaintiffs reply that Dr. Pirrong did, in fact, take account of Plaintiffs' prudent planning obligation by calculating the number of bales the shorts could have delivered if they had begun to prepare for delivery on April 6, 2011 for the May 2011 contract and June 15, 2011 for the July 2011 contract. *See* Motion to Exclude Pirrong Opp.

---

ginnings, and cotton that is on farms, in transit, and at mills." Expert Report of Matthew A. Evans ("Evans Responsive Report"), Exhibit 3 at ¶35.

at 10; *see also supra* note 11.  In light of Dr. Pirrong's calculation about the number of bales that shorts could have delivered if they had begun to prepare for delivery several weeks before the delivery month, the Parties' dispute boils down to whether Dr. Pirrong's time-window for the number of bales that could have been delivered is early enough to satisfy the "prudent planning" requirement.  This dispute is a factual one that goes to the weight of his testimony rather than its legal sufficiency or admissibility.  Dr. Pirrong did not "ignore" the prudent planning requirement, and disagreement over the time-window for commencing planning should be resolved by the trier of fact.

*Fourth*, Defendants object to Dr. Pirrong's analysis because his approach "relies on a series of restrictive logistical assumptions, namely: (i) it would typically take three or more weeks for non-ICE warehouses to load out cotton; (ii) non-ICE warehouses always would ship out only 4.5% of their capacity each week; and (iii) shorts could not deliver to non-ICE warehouses owned by Defendants," that are baseless and/or contradicted by the factual record. Motion to Exclude Pirrong at 16.  Plaintiffs reply that each of these assumptions is supported by facts in the record.  The warehouse delays are supported by Defendants' own statements, the testimony of Defendant Nicosia and Mr. Malone, and Dr. Pirrong's analysis of data from forty warehouses. Pl. Opp. to Motion to Exclude Pirrong at 11; *see also* Pirrong Report at ¶141 ("Forty warehouses have produced data that allows me to calculate the time difference between the time shipping orders were created during April, 2011 and the time cotton was shipped from these warehouses. . . . These figures suggest warehouse delays of about two to five weeks in the Southeast and Mid-South, and up to six weeks in the Southwest.").[13]  Similarly, the 4.5% weekly load out rate is supported by

---

[13] Defendants contend that one of Plaintiffs' other experts, John D. Mitchell, "acknowledged that load-out times vary and that cotton could be loaded out and moved from one warehouse to another in as little as a day or two." Motion to Exclude Pirrong at 16.  However, this was Mr. Mitchell's

the experts' agreement that cotton warehouses have a strong financial disincentive to load out faster than 4.5%. Pirrong Report ¶159.  Moreover, even factoring in the ten instances in which warehouses loaded out more than 4.5% of capacity, *see* Pirrong Amended Rebuttal Report (Exhibit 16, ¶256); Evans Responsive Report at ¶¶52–53, Dr. Pirrong noted that "his conclusions remain unchanged." Pirrong Amended Rebuttal Report ¶258.   Finally, Dr. Pirrong excluded ICE warehouses owned by Defendants because, according to Plaintiffs' expert John D. Mitchell, "[t]he shorts would not try to certificate and deliver in the long's warehouses" because "[t]he shorts would expect the long to claim that space was not available, and a short would not want to depend on the long to process their bales and samples." Expert Report of John D. Mitchell Exhibit 13 at ¶57.[14]  Thus, although Defendants are free to disagree with Dr. Pirrong's logical assumptions and may provide rebuttal testimony to undercut the weight provided to his analyses, his assumptions are amply based in the factual record developed by the Parties.

*Fifth*, Defendants object to Dr. Pirrong excluding "cotton from the 'Western Region' of the United States (which he defines as Arizona, California, and New Mexico) and west Texas." Motion to Exclude Pirrong at 15.  Dr. Pirrong excluded this cotton from his analysis because this cotton could not be made deliverable "at a cost less than the cost of obtaining *via* a cash market transaction" and the flow of cotton would thus be "abnormal and uneconomic." Pirrong Report at

---

answer to what would be "a timeline for what would be the bare minimum." Mitchel Deposition Exhibit 26 at 432: 11-433:5.  Mr. Mitchell went on to note that "in the time frame that we've been talking about, early April through last delivery day, May, it would have been very difficult, but possible." *Id.*at 432:25-433:5.  Accordingly, though it may have been possible to load out quickly, this does not undercut Dr. Pirrong's conclusion about the average delay in warehouse load out. Similarly, Defendants' assertion that "in one instance," Plaintiff Allen's former employer guaranteed load-out within four to nine days does not undercut Dr. Pirrong's analysis about the *average* delays of "three weeks to five weeks." Pirrong Report at ¶145.

[14] Indeed, contrary to Defendants' allegations, shorts did not deliver cotton into Defendants' warehouses. *See* Pl. Opposition to Motion to Exclude Pirrong at 12.

79.   Defendants contend this analysis is contrary to *Cox* and not supported by the record. Defendants reading of *Cox* is once again too broad.  The CFTC concluded in *Cox* that "[b]ased on our review of the record, we think the weight of the evidence does not warrant the exclusion of Kansas City as a 'normal' supply area for Chicago." *Cox*, 1987 WL 106879, at *6.  Defendants cite *Cox* for the proposition that "the supposed abnormality of delivery from a region is irrelevant." Motion to Exclude Pirrong at 15.  This is not so.  Instead, *Cox* explicitly left open the possibility that distance between markets is a factor. *Cox*, 1987 WL 106879, at *6 ("To the extent that distance between markets is a factor, New Orleans and Buffalo are more distant from Kansas City than is Chicago, and yet the record shows that Kansas City wheat was regularly deliverable to New Orleans and Buffalo during the period in question.").  Dr. Pirrong's exclusion was based on fact that the vast minority—less than 2%—of bales shipped from the Western Region are shipped to a state with an ICE certified warehouse, Pirrong Amended Rebuttal Report ¶144; that no bales were delivered from California, Arizona, and New Mexico for the May 2011 contract, *id.* at 148–149; and that only 2,353 were delivered from Arizona and New Mexico for the July 2011 contract (which constitutes less than 0.5% of total deliveries), *id.* at 140. *See also* Motion to Exclude Pirrong Opp. at 13.  Accordingly, the Court concludes that Dr. Pirrong's exclusion of the Western Region was not contrary to law, and the disputes raised by Defendants go to the weight of his testimony rather than its admissibility.

In sum, Defendants and their experts disagree with many of Dr. Pirrong's conclusions. Such disagreements are anticipated under FRE 702 and do not impact admissibility. *See* Advisory Committee Notes to the 2000 Amendments, FED. R. EVID. 702 ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an

expert's testimony on the ground that the court believes one version of the facts and not the other."). Dr. Pirrong's testimony is not contrary to law or the factual record, and to the extent any of his underlying assumptions are shaky, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

ii.   *Event Studies Analysis*

Dr. Pirrong testified that "event studies—the standard method that financial economists use to determine whether a particular event caused price movements—provide overwhelming evidence that the May 2011 cotton futures price was massively distorted—artificial—from April 1–May 4, 2011." Pirrong Report ¶186. Dr. Pirrong similarly testifies that the July 2011 cotton futures price was significantly distorted, artificially, from June 14, to July 5, 2011. Pirrong Report ¶444. Specifically, Dr. Pirrong testifies that "the May 2011 cotton futures price was artificial by 14–15 cents/lb. during April–May 2011." *Id.* at ¶235. Dr. Pirrong used the term "artificial" to mean prices "above the competitive price." *Id.* at ¶235 n.98. He testifies that "the July cotton futures price was artificial by as much as 32 cents/lb. during June–July 2011. *Id.* at ¶443. Dr. Pirrong's methodology is laid out in detail in his report. *See id.* at ¶¶ 208–236; ¶¶429–444.

"An event study is a regression analysis that seeks to show that the market price of a stock (or here a commodity) tends to respond to pertinent publicly reported events, in an attempt to isolate the effect of a certain event on the price." *Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Group, Inc.*, 431 F. Supp. 3d 1003, 1015 (N.D. Ill. 2020); *see also* Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation.*, 15 STAN. J.L. BUS. & FIN. 183, 190 (2009) (defining an event study as "a statistical regression analysis that examines the effect of an event . . . on a dependent

variable.") (internal quotation marks omitted).  Event studies first compare prices during a time period in which there is no alleged price artificiality (i.e., the "control period"), and once a relationship between the dependent and independent variable is established, the data is compared to a time period in which price artificiality may have occurred (i.e., the "event window").[15] *See* Motion to Exclude Pirrong Opp. at 15.   "An event study may be rejected . . . if it is methodologically unsound or unreliable." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 208 (2d Cir. 2008).  However, "[n]umerous courts have held that an event study is a reliable method for determining market efficiency and the market's responsiveness to certain events or information." *In re Barclays Bank PLC Securities Litig.*, 09-CV-1989, 2017 WL 4082305, at *21 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756 Fed. Appx. 41 (2d Cir. 2018) (unpublished).

"The first step in an event study is selecting an event window," *In re Sec. Capital Assur. Ltd. Securities Litig.*, 729 F. Supp. 2d 569, 600 n.5 (S.D.N.Y. 2010), though "[t]he selection of an appropriate event window is an inexact science." *United States v. Hatfield*, 06-CR-0550, 2014 WL

---

[15] A helpful example in a slightly different context—that of measuring damages to crop growers caused by crop contamination—is instructive.

> [An event study] identifies the amount of changes in crop prices as a result of specific events by using the relationship between the crop price series and a yardstick price series and the timing of those events in question. If choice of the yardstick series is made correctly, this yardstick price series and the crop price series should be cointegrated, to put it another way, they should move together over time as a result of either the yardstick price series or the crop price series being influenced by common market forces that affect cost and demand factors, as well as changes in macroeconomic factors, such as interest rates and inflation. For example, by using an event study, one can assess the changes in rice future prices as a result of a contamination of LLRICE by using the relationship between rice future prices and a price index that incorporates future prices of various grains.

Adam J. Levitt & Russell L. Lamb, *The Gift That Keeps on Giving: Price Overhang Damages in Commodity Crop Cases*, 51 Val. U. L. Rev. 375, 392 (2017); *see also*

7271616, at *12 (E.D.N.Y. Dec. 18, 2014).  An event window is the period during which the

alleged manipulative acts are expected to occur. *In re Sec. Capital Assur. Ltd. Securities Litig.*,

729 F. Supp. 2d at 600.  As Dr. Pirrong explains in the commodity futures context:

> A trader intending to execute a long manipulation wants to acquire a large long
> position without moving prices, and then force shorts to purchase those positions
> at an artificially high (i.e., supercompetitive price) when they attempt to liquidate.
> Therefore, in a squeeze or corner, the impact of manipulative acts is expected to
> occur when shorts attempt to exit their positions. Shorts attempt to liquidate their
> futures positions, either by outright purchases or rolling into the next delivery
> month via spread trades. The large, manipulative long is only willing to liquidate
> at a supercompetitive price. Hence, during the liquidation period, shorts bid up the
> price of the expiring future until the manipulator is willing to sell. Subsequent to
> the completion of the liquidation process, the futures price is expected to fall.

Pirrong Report ¶214; *see also* Frank H. Easterbrook, Monopoly, Manipulation, and the Regulation

of Futures Markets, 59 J. OF BUS. S103, S106 (1986) ("[T]he [manipulating] party may simply

decline to liquidate his position, so that at the very close of trading a formerly small holding

becomes large in relation to the open contracts. The holder of these contracts then demands or

tenders delivery . . . . Holders of opposite positions, surprised by the sudden demand or tender,

unable either to make or take delivery without incurring large costs, and unable to find other parties

with whom to close out their positions, must pay a premium to negotiate around the demand.").

 Dr. Pirrong defined the event period for his May 2011 analysis as March 30 to May 6,

2011; and his event window for his July 2011 as June 6 to July 7, 2011.  Defendants object to Dr.

Pirrong's selection of these event windows "as arbitrarily chosen to maximize his results."  Dr.

Pirrong explains, however, that he chose the May window because "rapid liquidation occurs during

the month prior to contract expiration" and that "65 percent of the maximum open interest is

liquidated on average during the last 29 trading days." Pirrong Report ¶215.  Defendants criticize

Dr. Pirrong's different methodologies used to calculate the event windows for the May and July

2011 contracts. Motion to Exclude Pirrong at 18 ("For the July Contract, Dr. Pirrong relies on a completely different approach: He starts the event window at the moment Defendants established a long position.").  Dr. Pirrong, however, provides an explanation for this difference: "Defendants did not being to accumulate their long positions in July futures contract until June 6. . . . Defendants obviously could not have acquired market power prior to that time, so there was no market power for shorts to learn about in their attempts to liquidate their short positions in the first week of June. Therefore, it is not appropriate to include that period in the event window." Pirrong Supplemental Response Report at 150.

Defendants provide their own expert report that indicates that changing the event windows from those used by Dr. Pirrong (to a start date of April 13, when Defendants' long futures position was at its peak) would reduce artificiality by nearly half.  Then, citing *LIBOR*, Defendants allege that Dr. Pirrong's event study should be excluded.  In *LIBOR*, the Court excluded the regression analysis of an expert because it concluded that he "cherry-picke[d]" the time periods in his regression analysis and lacked "an affirmative justification for adding [the relevant time period] to [his analysis] and a more robust explanation for why such an addition does not skew the results." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 484 (S.D.N.Y. 2018). Dr. Pirrong's analysis in this case distinguishable.  First, Dr. Pirrong does indeed provide a robust explanation for why he chose the event windows he did, even if Defendants expert disagrees with this choice. *See* Pirrong Amended Rebutal Report ¶373 ("I grounded my choices in the economics of corners, including a rigorous game theoretic model that specifically address how the liquidation process affects the information available to market participants, and how this information impacts prices.").  Second, Dr. Pirrong provides a reason for why the window proposed by Defendants (i.e., starting on April 13) would not properly capture the price artificiality. *See* Pirrong Amended

Rebuttal Report at ¶381 ("[Defendants'] market dominance was already established, and they only increased it during the March 30–April 13 period. Furthermore, as I noted in my report, there was already evidence that the contract was liquidating more slowly than normal during this period, in large part due to Defendants' continued buying during a period when most long hedgers are selling to reduce their positions in the expiring contract."). Finally, Dr. Pirrong also notes that, even starting the analysis at Defendants proposed date of April 13, "the increase in the May futures price through May 4, 2011 is statistically significant at extremely high confidence levels." *Id.* at ¶382.

Defendants also object to Dr. Pirrong's event study because it did not account for the unique nature of the 2010–2011 cotton crop season, including "record high prices and volatility." Motion to Exclude Pirrong at 19. In fact, they assert that Dr. Pirrong's analysis produces a number of false positive results for "artificiality" of prices. *Id.* It is true that "inconsistent results are an 'indicia of unreliability' in an expert's methodologies." *LIBOR*, 299 F. Supp. 3d at 468 (quoting *Lippe v. Bairnco Corp.*, 99 Fed. Appx. 274, 279 (2d Cir. 2004)). Notably, however, "sporadic findings of artificiality . . . may be attributable to statistical noise." *Id.* at 480. Defendants' expert identifies a statistically significant abnormal result for the event window of December 1, 2010 to December 31, 2010 for the March, May and July 2011 contract prices. Responsive Expert Report of John D. Finnerty, Ph.D., Exhibit 6. at ¶¶66–68. However, this analysis only identifies false positives for one additional event window (i.e., December 1–31, 2010). Moreover, even this statistical abnormality is a product of a different model than the one used by Dr. Pirrong. *See* Pl. Opp. to Motion to Exclude Pirrong at 22 ("Dr. Pirrong's primary model includes the July futures price and the cash price of cotton as control variables. Dr. Finnerty's [] false positive analysis includes only the July futures price."). Additionally, Dr. Pirrong's results had a relatively small

p-value, especially when compared to the "levels discussed by Dr. Finnerty." Pl. Opp. to Motion to Exclude Pirrong at 22.[16]  Finally, and perhaps most importantly, Dr. Pirrong spends significant time in his report accounting for the volatility, record prices, and low carryout rate of cotton during the 2010-2011 season. *Id.* Indeed, Dr. Pirrong performed "two alternative event studies, one with a control period limited to 2010/2011 crop year data and the other in which the variance of the residuals of the control regress can vary over time. . . . Dr. Pirrong also presented models (the supply of storage models) that demonstrated that the [low] carryout in 2011 could not explain the high May and July futures prices." *Id.*  As Dr. Pirrong notes, "[r]estricting the regression sample periods to the 2010/2011 crop year explicitly takes into account the level of volatility in prices during that period." Pirrong Supplemental Reubbtal Report at 213.  Plaintiffs have sufficiently demonstrated that the small number of false positives identified by Defendants' experts are "sporadic findings of artificiality" that do not render Dr. Pirrong's analysis unreliable. *LIBOR*, 299 F. Supp. 3d at 480.

In sum, Defendants' objections to Dr. Pirrong's event study go to its weight, not its reliability or admissibility. *See, e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429 (S.D.N.Y. 2014) ("[A]n expert who is conducting an event study necessarily must use his or her discretion to define selection criteria that are conducive to the execution of a meaningful multivariate regression analysis.").  Indeed, the Parties present a classic battle of the experts—with experts dueling over the intricacies of their statistical models. *See In re Joint E & S Dist. Asbestos*

---

[16] "'P-value' refers to the probability that the same results would be found if the null hypothesis of the study in question were true. *See* Federal Judicial Center, Reference Manual on Scientific Evidence 250 (3d 2011). For example, $p < 0.1$ means that the probability that the same results would be found if the null hypothesis of the study were true is less than 10%. $p < 0.05$ means that that probability is less than 5%. In practice, statistical analysts typically use $p < 0.05$ or $p < 0.01$. *Id. at 251*." *In re Neurotrope, Inc. Securities Litig.*, 315 F. Supp. 3d 721, 727 (S.D.N.Y. 2018).

*Lit.*, 52 F.3d 1124, 1135 (2d Cir. 1995) ("Trial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts").  The Court cannot choose, as a matter of law, which studies are more convincing.  The Court's only duty is to determine whether Dr. Pirrong's testimony is grounded in sufficient facts and data, that it is based on reliable principles and methods, and that he applied those principles and methods to this case.  At this stage in the litigation, Plaintiffs have met this burden.  Any additional deficiencies or questions as to Dr. Pirrong's artificiality testimony may be further explored at trial. *See Hershey v. Pacific Inv. Mgt. Co. LLC*, 697 F. Supp. 2d 945, 958 (N.D. Ill. 2010) ("Any deficiencies rioted by Defendant are properly brought out during its examination of Dr. Pirrong. Consequently, Dr. Pirrong's testimony regarding the presence of an artificial price is admissible.").

    iii.   *Causation*

Dr. Pirrong's theory of causation is as follows: Defendants caused the May 2011 contract price to rise "by an economically large and statistically significant amount during April, 2011" by "(a) amassing a May futures position far in excess in the supply of cotton deliverable at the competitive price, (b) increasing this futures position by over 100 percent and by an amount in excess of deliverable supply during the first two weeks of April, and (c) refusing to liquidate this position except at an artificially inflated price." Pirrong Report at ¶295.  Explained in more detail, Dr. Pirrong's testifies that:

> The results of the event study therefore provide strong evidence that [Defendants] caused the price of the May 2011 cotton futures contract to be artificially high. [Defendants'] large increase in its May futures position from March 30 through April 13, which occurred at a time when shorts and longs would normally liquidate their positions, signaled to the market participants that the market would not liquidate normally, and that there was a grave threat of a corner. Shorts attempting to liquidate their positions in a normal fashion bid up the price of the May future in a futile attempt to induce [Defendants] to liquidate. [Defendants were] only willing

to liquidate at an artificially high price, and shorts were willing to pay this price because the cost of making uneconomic deliveries was even greater.

Pirrong Report at ¶269; *see also* ¶462.[17]  Defendants object to this theory for four reasons.

*First*, Defendants object because Dr. Pirrong provides no evidence that a market participant actually relied on the excess open interest predicted by his model; and his assumption that open interest signals an imminent squeeze "makes no sense." *Id.* at 20–21.  Plaintiffs respond that, "[n]otwithstanding the issue of whether reliance is a necessary element of causation in a CEA case, Dr. Pirrong stated expressly that market participants' reliance on excess open interest is **not** a part of his causal theory." Motion to Exclude Pirrong Opp. at 25.  First, it is not clear whether individual reliance is a requirement for a manipulation-based claim. *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 570 (S.D.N.Y. 2016) ("In *Ploss*, the court assumed that . . . manipulation-based claims merely required that 'the market relies on the transactions to signal true, rather than manipulative, demand,' and that the alleged manipulation had a sufficient impact on the relevant market.") (citations omitted); *see also Ploss* (noting that Plaintiffs did not need to allege reliance where they alleged that "[Defendants'] high-volume futures acquisitions was 'willfully combined with something more to create a false impression of how market participants

---

[17] Dr. Pirrong elaborates on his theory of causation in his expert report:

> [T]he holder of a futures position that is larger than the quantity of the commodity available and eligible for deliverable under competitive conditions can exercise market power and *cause* (a) the price of the future that he is long to rise about the competitive price, and (b) the price of the deferred future to fall below the competitive price. The large long causes prices to be artificial (i.e., diverge from competitive values) by demanding excessive deliveries. Since deliveries and liquidations vary inversely one-for-one, it can also be said that the long causes prices to be artificial by liquidating (selling) too few of the expiring contracts that he holds. That is, too many deliveries implies too few liquidations.

Pirrong Report, Exhibit D ¶15.

value a security. . . . That 'something more' was a false signal through its market behavior that [Defendants] intended to source its wheat from the futures market, so that the transaction was not representative of true supply and demand. Market manipulation has been adequately alleged.") (citations omitted).   Regardless, Dr. Pirrong's event study "did in fact test whether market participants received information of an impending corner during the liquidation period when excess open interest was at times large: his event study evidence decisively rejected the null hypothesis that market participants did not become aware of a corner in the liquidation period of the May contract, or the period after Defendants accumulated a long position in the July contract." Motion to Exclude Pirrong Opp. at 26.   Moreover, Dr. Pirrong's theory does not, in fact, *require* reliance for his conclusions to be sound. *See* Pirrong Rebuttal Report (Exhibit 16) at ¶302 ("I never claimed that market participants contemporaneously used excess open interest for any purpose, including for trading. Nor is such 'reliance' necessary for or even relevant to my conclusions. I use excess open interest as a signal—an indication—that the May and subsequently the July cotton futures contracts liquidated unusually slow, as one would expect to occur during a corner when a large long only is willing to sell at artificially high prices. That is, I treat excess open interest as a symptom of manipulation.").   Though Defendants may challenge the weight of Dr. Pirrong's studies in light of the statistical methodologies he used to account for market participants receiving information of an impending corner, such challenges are better left for the trier of fact.

*Second*, Defendants contend that Dr. Pirrong failed to demonstrate a relationship between "artificiality" and either open interest or Defendants' futures trading.   Specifically, Defendants note that Dr. Pirrong "found no statistical relationship between the supposedly high open interest in this case and artificiality" and that he "does not conduct any study showing a relationship between Defendants' futures positions and alleged artificiality." Motion to Exclude Pirrong at 21–

22.    Dr. Pirrong's causation analysis, however, does not purport to demonstrate a causal relationship or correlation between artificiality and excess open interest. *See* Pirrong Rebuttal Repoert (Exhibit 16) at ¶321 ("I therefore use excess open interest as an 'indicator' for the purpose of identifying the event window during which price artificiality resulting from an exercise of market power would be expected to occur, and nothing more."). Thus, the lack of statistical relationship is not meaningful.   Dr. Pirrong also conducted extensive analysis to show a relationship between Defendants' positions and alleged artificiality, and concluded that "as Defendants' share of the open interest increased, the inversion between the May contract and July contract increased." *See* Motion to Exclude Pirrong Opp. at 28–29; *see also* Pirrong Report at ¶36 (concluding that "Defendants' increasing share of the open interest helped cause the May 2011– July 2011 spread to increase"). After reviewing Dr. Pirrong's causation analyses and his testimony, the Court concludes that he has sufficiently tested his theory of causation.

*Third*, Defendants object to Dr. Pirrong's analyses because he "fails to control for alternative causes." Motion to Exclude Pirrong at 22. Defendants' experts testify that "there was 'volatility and dysfunction' in the cotton market for months before the alleged 'manipulation' began." *Id.* Dr. Pirrong's analyses, however, do take into account external variables, including the volatility and dysfunction in the cotton market in the 2010–2011 crop season. After discussing and analyzing several other potential external factors—including global supply and demand of cotton—Pirrong concluded that "there were no other events occurring during the period in with [sic] the spread first widened substantially, and then collapsed, that could explain these extreme movements." Pirrong Report ¶273; *see also id.* at ¶215 ("This non-parametric analysis demonstrates that the open interest in the May contract was anomalously high during this period, and the anomaly grew during the period [Defendants] increased the size of its long May futures

49

position."); *see also* Motion to Exclude Pirrong Opp. at 28 ("Dr. Pirrong analyzed flat price-backwardation movements, spread-carryouts and spreads-inventory/use to explicitly test that fundamentals did not cause artificiality in cotton futures.") (citations omitted).  "While an expert need not rule out every potential cause in order to satisfy Daubert, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *In re Fosamax Products Liab. Litig.*, 647 F. Supp. 2d 265, 278 (S.D.N.Y. 2009) (citation and quotation marks omitted).  In this case, Dr. Pirrong has adequately ruled out the obvious alternative causes through both the variables in his event studies and his explanation of global cotton supply and demand trends during the 2010–2011 crop season.  To the extent Defendants disagree with his methodologies or conclusions, they are welcome to use cross-examination to address flaws they object to in his testimony.

*Finally*, Defendants claim that Dr. Pirrong's analysis does not account for ICE regulation and the fact that "[m]arket participants know that ICE monitors and regulates the futures market to ensure an orderly expiration and to prevent squeezes." Motion to Exclude Pirrong at 21.  Dr. Pirrong, however, spends a significant part of his rebuttal testimony addressing this very point. *See* Pirrong Rebuttal Report at ¶¶ 44–73.  Specifically, Dr. Pirrong provides a number of rebuttal arguments, including that: "there was considerable doubt among market participants that the market regulation process was sufficient to prevent cotton futures prices from becoming artificially high," *id.* ¶46; "Defendants' expert Mr. Egli also made it quite clear that he did not believe that ICE was taking measures sufficient to prevent prices from becoming artificial," *id.* at ¶49; "ICE lacks information that would better allow it to determine whether an orderly liquidation is occurring," *id.* at ¶55; and "ICE took action only *after* Defendants had amassed a large position which gave them market power," *id.* at ¶66.  This led him to the conclude that "ICE's performance

of its market regulatory function during April–July, 2011 was **NOT** sufficient to prevent the prices

of the May or July cotton futures contracts from becoming artificially high." *Id.* at ¶73. The Court

does not credit Dr. Pirrong's testimony as necessarily persuasive or sufficient to rebut Defendants'

arguments about ICE regulation. However, the Court does conclude that Dr. Pirrong adequately

addressed the issue of the impact of ICE's regulation on his causation analysis and dismisses

Defendants' objections that his analysis "ignores that [ICE] actively managed down Defendants'

position." Motion to Exclude Pirrong at 5.

  iv. *Inadmissible Legal Conclusions and Opinions Regarding State of Mind*

  Finally, Defendants contend that Dr. Pirrong's report contains impermissible legal analyses

and conclusions and inadmissible opinions regarding Defendants' state of mind. Specifically,

Defendants assert that Dr. Pirrong's report "is replete with inadmissible legal conclusions—

including his repeated assertion that Defendants engaged in 'classic manipulative conduct' and

that Defendants' actions 'constitute classical conduct to squeeze and corner.'" Motion to Exclude

Pirrong at 5. Defendants also object to Dr. Pirrong's testimony regarding Defendants' state of

mind, including his testimony that Defendants "followed this manipulative playbook to the letter,"

that "a firm that takes delivery when the futures price exceeds the cost of obtaining the commodity

from other sources . . . is acting with the specific intent of exercising market power and distorting

prices," and that Defendants "knew that it would have been impossible to acquire more than

300,000–500,000 bales of cotton via the delivery process." *Id.* at 24.

  As discussed above, Dr. Pirrong cannot testify as to Defendants' state of mind when they

made certain business decisions or Defendants' specific intent or motive. *See LaSalle Bank Nat.*

*Ass'n*, 2012 WL 466785, at *7 ("[A]n expert may not testify as to facts not within his personal

knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or

as to the credibility of witnesses.") (citation omitted); *see also In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").  However, "an expert can testify to whether a given practice is consistent with a given state of mind." *Wilson*, 2016 WL 7229056, at *8. Therefore, Dr. Pirrong's testimony about Defendants' knowledge in light of their actions—e.g., that Defendants would have known they had a dominant position in the market—are admissible. However, his testimony as to Defendants' specific motivations, knowledge, or intent—e.g, that "Defendants clearly understood" certain "logistical constraints"—is inadmissible. *See Hershey*, 697 F. Supp. 2d at 958 ("For the reasons already expressed, Dr. Pirrong's opinions regarding PIMCO's and the CBOT's state of mind are excluded.").

Similarly, to the extent any of Dr. Pirrong's testimony expresses a legal conclusion—e.g., that Defendants "engaged in classical manipulative squeezing and cornering conduct," or that Defendants "conduct was uncommercial, uncompetitive, and manipulative"—it is inadmissible and excluded. *See Hershey*, 697 F. Supp. 2d at 958 ("Dr. Pirrong's testimony regarding ultimate issues and legal conclusions is barred.").  However, his testimony regarding "factual conclusions that . . . embrace an ultimate issue to be decided by the jury," are, of course, admissible. *Bilzerian*, 926 F.2d at 1294.  This includes his testimony that describes the concepts of market manipulation, cornering, or monopolistic conduct from an economics perspective.  This also includes his testimony that certain conduct "implies manipulation," to the extent he is testifying about the economic realities of Defendants' conduct rather than the ultimate legal conclusion that Defendants' violated the law. *See SEC v. United States Envtl., Inc.*, 2002 WL 31323832, at *5 (S.D.N.Y. Oct. 16, 2002).

This is especially true in a case like this where an experts' testimony regarding complex market issues may use words—such as "manipulative," "uncommercial," "artificially distorted," "supercompetitive," or "uneconomic"—to describe market forces and economics generally even though these words also carry legal significance. There is a fine line between testimony explaining what manipulative squeezing conduct is or how Defendants' trading methods resemble such conduct; and testimony about Defendants' illegal manipulation pursuant to the CEA. *See Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1997) (An expert "may tell the jury whether he thinks the method of trading was normal, but not, in our view, whether it amounted to illegal manipulation."). To the extent any of Dr. Pirrong's statements fall on this line, a limiting instruction to the jury may be appropriate to resolve the issue. *See Bilzerian*, 926 F.2d at 1295 (finding no abuse of discretion in admitting expert testimony that explained federal securities regulation and filing requirements where the judge gave a limiting instruction to the jury that the court alone would instruct the jury about the law and that the expert "is not here to give his opinion as to what the law requires"); *see also Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) ("In the instant case, the trial judge properly advised the jury to follow the law, rather than the testimony of any witness."). To the extent any of Dr. Pirrong's expert report not objected to by Defendants includes testimony stating an ultimate legal conclusion or impermissibly testifies to Plaintiffs' mental state, the Court does not consider such testimony.

In sum, the Court largely finds Dr. Pirrong and Mr. Marshall's testimony reliable and admissible. This is not to say that the Court credits these experts' testimony version of the facts or concludes that their testimony should be given weight by the jury. However, the objections raised by Defendants predominantly go weight of the testimony and not to its admissibility or reliability. The weight and credibility of the experts can and should be explored on cross-

examination. *See Daubert*, 609 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").   Moreover, minor methodological flaws that Defendants allege in Dr. Pirrong and Mr. Marshall's analyses do not undermine their reliability or render these experts' testimony inadmissible. *Amorgianos*, 303 F.3d at 267 ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible.").   While the admissibility of some of the testimony presented is a closer call, the rules of evidence favor admissibility and deferring consideration of genuine factual issues until trial. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 562 (S.D.N.Y. 2007) ("[T]he Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system.") (internal quotation marks and citations omitted).

## II.   Motion for Summary Judgment

Plaintiffs allege Defendants engaged in market manipulation in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9, 13(a), 13b, 25(a) (2013), and that Defendants willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA. Plaintiffs bring antitrust claims under the Sherman Act, 15 U.S.C. §2 (2013).

### A.   CEA Manipulation Claim

The CEA makes it illegal "to manipulate or attempt to manipulate the price of any commodity . . . ." 7 U.S.C. § 13(a)(2).   Drawing from the decisions of the Commodity Futures Trading Commission ("CFTC"), courts have developed a four-factor test to determine whether prices have been manipulated: "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants

specifically intended to cause the artificial price." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (quoting *Hershey v. Energy Transfer Partners*, 610 F.3d 239, 247 (5th Cir. 2010)).

      i.   *Ability to Influence Market Prices*

Market control over the deliverable supply of a commodity is necessary to influence prices when a "squeeze" is alleged. The CFTC explained this requirement in *Cox*[18] and *Indiana Farm Bureau*[19]:

> When analyzing the ability of the accused to influence market prices, we must recognize that there are two ways to satisfy futures obligations: offset in the futures market or delivery of the underlying commodity. The accused lacks the ability to influence prices if other market participants can bypass his demands and extinguish their obligations elsewhere. Here, as in Indiana Farm Bureau, we are confronted with an arguably congested market and the claim that respondents either were responsible for the congestion or unlawfully exacerbated it. But as we recognized in Indiana Farm Burea [sic] 'squeezes in general and manipulative squeezes in particular are possible only when the delivery option disappears and its tempering effect is lost. Thus, the adequacy of "deliverable supply," as distinguished from supply generally, and the role of market participants in the supply scenario is of great significance in any analysis. . . . The acquisition of market dominance is the hallmark of a long manipulative squeeze. For without the ability to force shorts to deal with him either in the cash or futures market, the (long) manipulator is not able successfully to dictate prices because a short may buy grain from other sources and deliver against his commitments.'

*Cox*, 1987 WL 106879, at *4 (internal citations omitted). As this Court noted in *Cotton I*, "manipulation through a squeeze could be accomplished by a long who holds dominant positions in the futures market *and* exerts control over the market for the deliverable supply of the commodity *or* intentionally exacerbates market congestion by taking positive steps to disrupt

---

[18] *In re Cox ("Cox")*, 1987 WL 106879, at *4–8 (CFTC July 15, 1987).
[19] *In re Ind. Farm Bureau Coop. Ass'n Inc. ("Indiana Farm Bureau")*, 1982 WL 30249, at *9 (CFTC Dec. 17, 1982).

orderly settlement with knowledge of congested market conditions." *Cotton I*, 2013 WL 9815198, at *12.[20]

Plaintiffs allege that Defendants intentionally exacerbated market conditions by taking positive steps to disrupt the orderly settlement of futures contracts with knowledge of congested market conditions.   Specifically, Plaintiffs allege that Defendants engaged in uneconomic conduct—including "insisting upon record ratios of deliveries, depleting certificated supplies of cotton, and refusing to retender"—all while "knowing cotton could not be certificated in time to satisfy delivery on the contracts." *Cotton I*, 2013 WL 9815198 at *10–11.  Thus, by "continuing to acquire dominant long positions in excess of the certificated cotton supply and stopping the contracts, Defendants effectuated a squeeze, knowing it would be impossible for Plaintiffs to certificate more cotton in time for delivery." *Id.* at *11.  For the reasons below, a reasonable jury could conclude that the market for deliverable cotton was congested, that Defendants were aware of this congestion, and that they took steps to disrupt the orderly settlement of the contracts.

Dr. Pirrong's admissible testimony concludes that for the May 2011 contract there were 394,000 bales of deliverable supply inside ICE warehouses and for the July 2011 contract there 211,000 bales. Pirrong Report ¶¶106, 400; Pirrong Supp. Report at ¶4.  He also testified that the

---

[20] This conclusion is supported by *Abrams*: "While holders of dominant long positions should normally be free to reap the benefits of their foresight during a contract's final trading days, a congested market is not an appropriate venue for unrestrained self-interest. Once such a dominant long has knowledge of a congested situation, the least we can demand is that he not take positive steps (such as increasing his position) which are likely to increase the threat to the orderly settlement of the underlying contract." *In re Abrams*, Comm. Fut. L. Rep. (CCH) ¶ 25,684, 1993 WL 140823, at *5 (CFTC May 4, 1993).  This theory places the burden on dominant longs to not act once they have knowledge of a congested market, despite otherwise legitimate market forces pushing them to "reap the benefits of their foresight." *Id.*  Indeed, with a long's dominant position in a market comes a responsibility not to exploit that power. *See* Stan Lee, *Introducing Spider Man*, AMAZING FANTASY #15, (Marvel Comics 1962) ("With great power comes great responsibility"); *see also* Winston Churchill, First Session of the Twenty-Eighth Parliament of the United Kingdom of Great Britain and Ireland, The Parliamentary Debates (1906) (same).

volume of additional bales that could be timely certificated and delivered was, at most 366,000 bales for the May 2011 contract and between 119,000 and 227,000 bales for the July 2011 contract. *Id.* at ¶¶72–74, 162–63, 412–28.  Defendants at their peak held 3,093,200 bales in the May contract and 1,166,300 in the July contract, UMF ¶¶861, 931, and ultimately took delivery of 389,800 bales on the May contract and 161,300 bales on the July contract, UMF ¶154.  Comparing the peak ICE-certificated stocks for the time periods when Defendants were allegedly adding to their Contract positions despite the knowledge of congestion—i.e., 219,068 for the May Contract and 65,803 for the July Contract—a reasonable jury could conclude that the market was congested. UMF ¶¶448, 931.  Moreover, comparing the stocks of tenderable quality cotton not committed to sale in ICE warehouses (i.e., 394,000 bales) with the total delivery sought by Defendants (i.e., 389,800) bales could lead a jury to conclude that the market was congested because deliverable supplies were essentially in equilibrium with the deliveries sought by Defendants. *See Indiana Farm*, 1982 WL 30249, at *8 (defining "congestion" as "a condition in maturing futures where sellers . . . find there are no new sellers from whom they can buy, deliverable stocks are low, and it is too late to procure the actual commodity elsewhere to settle by delivery.") (citation omitted); *cf In re Cox*, 1987 106879, at *8 ("market congestion cannot exist when deliverable supplies are adequate.").

Defendants do not offer an estimate of deliverable supply but instead provide that USDA reports showed that there were 6,446,000 bales of cotton in the U.S. as of May 2011 and 3,743,000 bales as of July 2011. Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def. MSJ") (ECF No. 532) at 23; *see also* UMF ¶¶ 126–28.  However, precedent makes clear that the distinction between deliverable supply and supply generally is paramount in a congestion analysis. *See Cotton I*, 2013 WL 9815198, at *12 ("Thus, the adequacy of 'deliverable supply,' as distinguished from supply generally, and the role of market participants in the supply

scenario is of great significance in any analysis.") (quoting *Cox*, 1987 WL 106879, at *4).  At best, Defendants create triable issues of fact between the admissible testimony of Plaintiffs' expert that "Defendants' large long futures position in the May 2011 contract far exceeded the supplies of cotton available for delivery against the May 2011 contract," Pirrong Supp. Report at 3, and Defendants contention that the market was not congested.

Plaintiffs allege that Defendants knew of the congested market because of ICE publications about the amounts of certificated cotton and bales pending certification in ICE warehouses, because of signals given by market prices, and because of statements made by Defendants about warehouse congestion. Pl. MSJ Opp. at 6–7.  Specifically, Defendants wrote about "very long warehouse delays" in their request for exemption from position limits to ICE. *Id.* at 7; *see also* UMF ¶273.  Defendants also informed ICE about warehouse delays averaging six weeks based on a survey of Texas warehouses conducted by Defendants. UMF ¶499; Pl. MSJ Opp. at 13. Moreover, Defendants' long positions were, at times, several multiples larger than the publicly reported ICE certified stocks. *See* Pl. MSJ Opp. ("On April 1, 13 and 25, [Defendants'] long position in the May 2011 contract was **11.2, 14.1 and 3.1** times as large as publicly reported ICE certified stocks."  Defendants also noted to ICE that "[i]n the past month, there has been very little cotton offered for sale in the USA. The little that was available was encumbered by warehouse delays or logistical constraints." *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. MSJ Opp.") (ECF No. 562) at 22; UMF ¶547.  This conglomeration of evidence could lead a reasonable jury to conclude that Defendants were, in fact, aware of the congested market.

Finally, Plaintiffs allege that despite knowledge of the market congestion, Defendants added significantly to their long positions in the May 2011 and July 2011 contracts.  Specifically,

Defendants increased their May Contract long positions from 1,457,400 bales on March 29, 2011 to 3,093,200 bales on April 13. UMF ¶448; Pl. MSJ Opp. at 12.  Similarly, Defendants added more than one million bales to their long position from June 6, 2011 to June 20, 2011. UMF ¶931; Pl. MSJ Opp. at 13.  Plaintiffs also allege that Defendants refused to buy cotton in the cash markets from Glencore and other market participants. UMF ¶637–38; Pl. MSJ Opp. at 9.

Defendants advance several arguments challenging Plaintiffs' allegations.  First, they contend that "ICE officials carefully and contemporaneously monitored the physical and futures markets for cotton, including by estimating deliverable supply." Def. MSJ at 21.  It is indeed true that ICE has the authority to "prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. §7(d)(4); *see also supra* (I)(A)(iv).  Defendants contend that ICE was actively monitoring Defendants' positions, ICE granted Defendants' position limit exemptions, and then ICE managed down Defendants' long position as the May and July Contracts approached the notice period. Def. MSJ at 21.  According to Defendants, the fact that they complied with ICE's directives undermines allegations that the market was congested and that Defendants acted improperly to exacerbate that congestion. *Id.* at 21–23.  However, Defendants cite no cases that support the proposition that regulatory oversight from an exchange precludes finding that a defendant had the ability to influence prices.  Indeed, if Defendants argument was true, then ICE and the CFTC's regulatory authority alone would significantly undermine the private right of action to enforce commodity laws recognized and affirmed by the Supreme Court. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) (finding implied private right of action under the Commodity Exchange Act).  This is not to say that ICE's regulation of Defendants

was entirely futile. As Plaintiffs note, "ICE's discretionary actions may have tempered the amount of [Defendants'] manipulative impact on prices . . . ." Pl. MSJ Opp. at 23.

Next, Defendants assert that they did not take "positive steps" to exacerbate any existing congestion and, in fact, reduced their positions for the last several weeks of trading. Def. MSJ at 22–23; *see also* Def. MSJ Reply ("No reasonable jury could find that merely *acquiring* a long position *before* the delivery month interferes with 'orderly settlement,' *especially* where—as here—the CFTC found that there was, in fact, 'orderly expiration.'") (citation omitted). Defendants argue that cases finding a "squeeze" generally involve allegations that a defendant "held or increased dominant long positions in the *final days, hours, minutes* or event [sic] *seconds* of trading." Def. MSJ at 22.  However, precedent does not establish this as a requirement of an alleged squeeze.  The Court cannot find, nor do the Parties cite any cases, to support the proposition that there is a temporal requirement for an alleged "squeeze."   Plaintiffs allegations that Defendants' dramatically increased their long position *after* knowledge of a congested market is enough to satisfy the "positive steps" requirement.  Whether this increase took place in the final days or final weeks of trading does not impact the merits of Plaintiffs' claim. *See Matter of Abrams*, 1993 WL 140823, at *5 ("Once such a dominant long has knowledge of a congested situation, the least we can demand is that he not take positive steps (such as increasing his position) which are likely to increase the threat to the orderly settlement of the underlying contract.").

Third, Defendants argue that "it was the shorts' inadequate preparations that caused any delivery constraints." Def. MSJ at 27.  Specifically, Defendants allege that Plaintiffs did not make any preparation for delivery.  As discussed above, shorts have an obligation to enter the delivery month having made adequate delivery preparations. *See Cox*, 1987 WL 106879, at *6 ("[I]t is irresponsible market behavior for shorts to enter the delivery month especially where low cash

supplies are evident at the delivery point, without making adequate delivery preparations."). This obligation is "particularly true when the short is an experienced futures market participant, sufficiently skilled to locate out-of-town wheat supplies for delivery on relatively short notice." *Id.* Plaintiffs, however, assert that Glencore (the largest short) did indeed deliver 212,000 bales against the May Contract, which is larger than the level of ICE certified stocks on April 5, 2011 (i.e., 207,747). *Id.* Plaintiffs also note that Glencore "offered as many as 500,000 bales of cotton directly to [Defendants] via exchange of futures for physical (or "EFP") between April 19–21, 2011." *Id.* Similarly, for the July Contract, "shorts added at least 120,793 additional bales to ICE certified stocks" after Defendants began to add to their July 2011 contract long position. *Id.* Finally, Plaintiffs provide expert testimony that "in the period of time following [Defendants'] massive and uneconomic increase in its May position, and the subsequent signals that the May contract would not liquidate normally, shorts undertook efforts to secure, make deliverable, and deliver large quantities of cotton." Pirrong Report at ¶652. Though Defendants may disagree with Plaintiffs' contention and expert testimony, a reasonable jury could conclude that Plaintiffs did, in fact, make adequate delivery preparations in light of Defendants' conduct and the market conditions.

      ii.   *Manipulative Intent*

Plaintiffs allege that manipulative intent can be inferred from Defendants' dominant long positions in the futures market coupled with Defendants' alleged uneconomic conduct. Specifically, Plaintiffs point to the following circumstantial evidence to indicate Defendants' intent: (1) Defendants added to their long positions in the face of known congestion; (2) Defendants refused certain buybacks and cash purchases; and (3) Defendants made alleged misrepresentations to ICE.

In *Cotton I*, the Court concluded "It can be reasonably inferred from these allegations that Defendants knowingly and actively disrupted an already congested market where the deliverable supply was insufficient to cover the open interest with the intention of seeking artificially high prices from shorts to offset their positions." 2013 WL 9815198 at *17.  After further review of the evidence, the Court agrees that a reasonable jury could infer the Defendants acted with the purpose of influencing prices.

The CFTC elaborated on the intent element of a CEA manipulation claim in *Indiana Farm*:

> [I]n order to prove the intent element of a manipulation or attempted manipulation of a futures contract price[,] . . . it must be proven that the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand influencing futures prices in the particular market at the time of the alleged manipulative activity. Since proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused. But once it is demonstrated that the alleged manipulator sought, by act or omission, to move the market away from the equilibrium or efficient price— the price which reflects the market forces of supply and demand—the mental element of manipulation may be inferred.

1982 WL 30249, at *7.  "Holding out for high prices is normally rational and lawful market behavior. Such activity only becomes unlawful when it is accompanied by manipulative intent as generally manifested by conduct other than simply seeking the best price in a pit in which there may be supply shortages." *Id.* at 8 (internal citations omitted).  Hence, "where there is evidence that the deliverable supply was intentionally and significantly reduced[,] . . . the seeking of 'unreasonably high prices,' which otherwise would be lawful conduct, becomes susceptible to an inference that the true purpose of the activities of the accused is to create prices not responsive to the forces of supply and demand." *Id.* at 9.

As the CFTC has acknowledged, "in the context of attempted manipulation, the credibility and demeanor of the witnesses is often the most telling part of the evidence." *Matter of Abrams*,

1993 WL 140823, at *4 (citation, quotation marks, and alterations omitted).  Indeed, because of the fact-intensive nature of the intent inquiry, "[a]s a general matter . . . questions of intent are inappropriate for resolution on summary judgment." *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1058 (N.D. Ill. 1995).

Plaintiffs first contend that Defendants' actions in almost doubling their long positions "with full knowledge that publicly reported ICE certified stocks were low (202,000 to 220,000 bales) and that warehouse delays were long (an average of six weeks for a few thousand bales according to [Defendant])" demonstrates Defendants' manipulative intent. Pl. MSJ Opp. at 30. Defendants, on the other hand, argue that even assuming they had *knowledge* of the congestion in the market, that does not prove they had manipulative *intent*. *See Amaranth*, 587 F. Supp. 2d at 539 ("[E]ntering into a legitimate transaction knowing that it will distort the market is not manipulation—only intent, not knowledge, can transform a legitimate transaction into manipulation.").  However, Plaintiffs' allegations are distinguishable from those in *Amaranth*, where the plaintiffs alleged that "Amaranth engaged in the classic manipulative act of buying and leaving open increasingly large positions which, due to their extraordinary but increasing size, caused prices to move in their favor." *Id.*  Instead, Plaintiffs here allege that Defendants knew of market congestion, exacerbated this congestion by acquiring additional long positions in spite of the market realities, and then demanded delivery notwithstanding the availability of lower-priced cash market cotton and offers for EFPs. *Cotton I*, 2013 WL 9815198 at *14.  As the CFTC has acknowledged, "manipulative intent may be inferred when the holder of a long position increases his position despite knowledge of a congested situation in the underlying contract." *Matter of Abrams*, 1993 WL 140823, at *5.  The CFTC in *Abrams* went on to note that "the ALJ could not properly credit [Defendants'] innocent explanation for his conduct until the Division was given an

opportunity to develop the record and cross-examine [Defendant] about his alleged attempt to exacerbate the apparent congestion in the [] market." *Id.*  Defendants similarly present innocent explanations for their conduct—namely that Defendants "thought cotton was available for deliver, and rationally relied on 'shorts owning up to their obligation to provide cotton' using what was available." Def. MSJ Reply at 15.  Crediting such an assertion is inappropriate at the summary judgement stage and is better left to a trier of fact.

Plaintiffs also allege that Defendants took inadequate steps to reduce demand in the market by refusing certain buybacks and cash purchases, further indicating their manipulative intent. Plaintiffs allege that Defendants lowered their buyback bids "despite already historically attractive price levels," which resulted in a slower buyback process than usual. Pl. MSJ Opp. at 31.  Further, Plaintiffs allege that Defendants refused to purchase cheaper cotton in the cash market despite it being against Defendants' economic interest. *Id.* at 32.  Defendants, on the other hand, assert that "the record makes clear that Defendants sought to *reduce demand* for physical cotton." Def. MSJ at 30.  Essentially, Plaintiffs contend that Defendants did not do enough to reduce demand, while Defendants point to those same efforts to reduce demand as evidence of the lack of intent. Def. MSJ Reply at 17 ("Proving the axiom that no good deed goes unpunished, Plaintiffs illogically contend that Defendants' steps to reduce demand in the market somehow *demonstrate* intent."). While Defendants' argument—i.e., that their efforts to reduce demand indicates the lack of intent—seems initially persuasive, to the extent Defendants slow-played or rejected buyback and cash purchases to their own economic detriment (as Plaintiffs allege), then the lack of further efforts to reduce demand may indicate intent.  *See, e.g.*, *DiPlacido*, 2008 WL 4831204 at *30 ("Whenever a buyer on the Exchange intentionally pays more than he has to for the purpose of causing the quoted price to be higher than it would otherwise have been (or, conversely, a seller

on the Exchange intentionally sells cheaper than necessary for the purpose of causing the quoted price to be less than it would otherwise have been), the resultant price is an artificial price not determined by the free forces of supply and demand on the Exchange.").

Plaintiffs provide some evidence that Defendants did not purchase buybacks with sufficient urgency and that Defendants refused to buy cotton on the cash market. For example, Plaintiffs point to Glencore's offer of 800,000 bales of physical cotton—300,000 bales on the SEAM, UMF ¶188; and 500,000 directly, UMF ¶191—which Defendants rejected despite the alleged "substantial price, quality, and other advantages inherent in such offers." TCAC ¶61. Defendants, however, assert that this was the only rejected cash offer that Plaintiffs can point to, and that they had legitimate reasons for rejecting the offer. Def. MSJ at 32 ("Plaintiffs are incorrect in claiming that the cash offer had 'substantial price, quality and other advantages,' as compared to cotton deliverable on ICE—in fact, Glencore's offer was remarkably vague as to the quality, location, and date of delivery."). Plaintiffs' expert John Mitchell testifies otherwise, noting that the cotton in the Glencore offer "was substantially equal to the terms, and quality of the ICE No. 2 contract." Rebuttal Expert Report of John D. Mitchell (Rod.D., Exhibit 64, ¶33–34); *see also* UMF ¶680; *see also* Pl. MSJ Opp. at 38.[21] This battle of the experts over important, factual disputes—e.g., the alleged quality, location, and delivery date of cotton—is not appropriately resolved at summary judgment. *See In re Joint E & S Dist. Asbestos Lit.*, 52 F.3d 1124, 1135 (2d Cir. 1995) ("Trial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert

---

[21] Defendants also contest the amount of cotton that Glencore offered: "This means that Gelncore's 300,000 bale offer on the SEAM, and the 500,000 bale offer made directly to Defendants, could easily have involved the same cotton (meaning that, at most, Defendants were offered 500,000 bales during this time)." *Id.*

witnesses by simply choosing sides in the battle of the experts") (quotation marks and alterations omitted)).

Defendants also point to a number of other actions they took to reduce demand, including buybacks, rolling sales forward, delaying shipments, and substituting with non-U.S. cotton in order to free up U.S. cotton. Def. MSJ at 30.  Dr. Pirrong testifies otherwise, concluding that Defendants "consciously and deliberately passed up opportunities to buy large quantities of cotton at prices well below delivery values." Pirrong Report ¶515.  In sum, Defendants assert that "there were a multitude of reasons Defendants declined to accept Glencore's offer that had nothing at al to do with any intent to manipulate the cotton market." Def. MSJ at 32.  This very well may be true. However, to make this determination would involve this Court making significant credibility determinations and weighing the opinions of expert testimony—something this Court is not permitted to do at this stage of the litigation.  The factual disagreement between the Parties is genuine and material—that is, a reasonable fact tinder could render a verdict in Plaintiffs' favor on this issue and the issue may affect the outcome of the case.

Finally, Plaintiffs point to Defendants' alleged misrepresentations made to ICE as evidence of their manipulative motive.  Specifically, Plaintiffs allege that Defendants incorrectly represented to ICE that their May 2011 contract position was a "bona fide hedge;" that Defendants represented to ICE that they were making "extensive" efforts to buyback cotton even though they were not; and that Defendants made representations to ICE concerning the size of their unfilled sales contracts and size of their cotton inventory that were incorrect. Pl. MSJ Opp. at 33.  Plaintiffs' expert Gerald Marshall dedicates much of his testimony to describing why Defendants' statements to ICE were "contrary to facts and misleading." Marshall Report at ¶26, 27–31.  Though Marshall does not allege that Defendants' statements actually misled ICE, he does testify as to why, in light

of the shipping window under ICE rules, the price of ICE cotton futures, cotton demand globally, and other market conditions, Defendants' statements to ICE were misleading.  Defendants contest each of these alleged misstatements noting that they did engage in extensive buyback efforts (as discussed above), that they were engaged in bona fide hedge activities (as discussed below), and that they did not mislead ICE with regard to their inventory statements. Def. MSJ Reply at 19.  A reasonable trier of fact could conclude, with the benefit of Mr. Marshall's testimony and the factual record, that Defendants' statements to ICE were misleading—either because Defendants did not engage in "extensive" buybacks, because Defendants' were not engaging in bona fide hedge activities, or because Defendants' inventory representations were misleading—and that such misleading statements are circumstantial evidence of manipulative intent. *See, e.g.*, *Laydon v. Mizuho Bank, Ltd.*, 12-CV-3419, 2014 WL 1280464, at *6 (S.D.N.Y. Mar. 28, 2014) (concluding a court could use the fact that Defendants "actively concealed their violations of law from regulators and innocent market participants" to infer manipulative intent).

Defendants argue that they could not have manipulative intent because their long positions were "bona fide hedges of their large sales commitments." Def MSJ at 29.  As discussed above, a "hedger" is "a trader with an interest in the cash market for the commodity, who deals in futures contracts as a means of transferring risks he faces in the cash market." *Leist v. Simplot*, 638 F.2d 283, 287 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).  Bona fide hedging positions "normally represent a substitute for . . . positions to be taken at a later time in a physical marketing channel, and where they are economically appropriate to the reduction of risks in the conduct and management of a commercial enterprise." 17 C.F.R. § 1.3.  Defendants assert that "as one of the largest cotton merchants in the United States," they "had contractual obligations to deliver millions of bales of cotton to customers." Def.

MSJ at 29.  Importantly, Defendants note that they never exceeded the limited permission given by ICE to hedge using futures positions, and that their contractual commitments to deliver cotton exceeded their largest long positions in the May and July Contracts. *Id.*  Indeed, Defendants note that they used more than 99% of the deliveries they took on May and July Contracts to fulfill sales contracts. *Id.* at 30.

Plaintiffs contend that Defendants' positions were not bona fide hedges because the increase in long positions *increased* Defendants' price risk.[22]  Specifically, Plaintiffs point to calculations of the "Value at Risk" metric and the lack of change in the cash market activity.[23] Plaintiffs allege that Defendants' "own internal risk valuation reports reflect that [Defendants'] long positions substantially *increased* [Defendants'] price risk" because VaR increased "by almost 50% at the same time as [Defendants] were greatly adding to their long May 2011 contract position and short July 2011 contract position." Pl. MSJ Opp. at 35.  This increase in VaR would be consistent with speculative, rather than hedging, activities. *See* Pirrong Report at ¶349 ("This parallel increase in the size of the spread position and VaR is consistent with the spread position being speculative, rather than a hedge.").  Plaintiffs' expert Gerald Marshall also testifies that "during this period when there was little net cash market activity that necessitated a need for

---

[22] Plaintiffs also argue that, even if Defendants' positions were bona fide hedges, "it still would have been manipulative to greatly add to their long positions in a congested market." Pl. MSJ Opp. at 34.  Because the Court concludes that there are genuine issues of material fact as to whether Defendants engaged in bona fide hedging activity, the Court does not address this argument of Plaintiffs.

[23] The Value at Risk metric is "the most common measure of position price risk employed by commodity traders such as Dreyfus. VaR is the amount (or more) that can be lost over a given time horizon (e.g., a day) with some probability (e.g., 1 percent). For instance, a one percent, one-day VaR of $15 million means that there is a one percent chance of losing at least $15 million in a day." Pirrong Report ¶343.  "The larger the VaR, the greater the risk: the smaller the VaR, the less the risk. Therefore, since a hedge reduces risk, a hedge position should reduce VaR. Conversely, a speculative position increases VaR." *Id.* at ¶247.

additional hedging, [Defendants'] futures positions changed enormously." Marshall Report ¶14. Marshall goes on to note that "[i]n the absence of fresh underlying cash activity and for the other reasons developed in this report, [Defendants'] futures spreading activity was, in my opinion, speculation, not hedging." *Id.* at ¶15.

Defendants allege that an increase VaR cannot by itself turn a transaction from a bona fide hedge into speculation. *See* Def. MSJ Reply at 16 ("In reality, VaR is only one of many risk metrics that sophisticated commodities firms use to assess risk. . . . [J]ust because transactions hedging a firm's overall risk increase VaR does not mean that those transactions are not hedges."). Indeed, Defendants assert that "they hedged their risk based on a number of issues that would not be adequately captures by VaR, including: sales in excess of Defendants' inventory; potential new sales with near-term delivery; logistical risks; threats from potentially defaulting customers and supplies; or stocks and purchases that could not be used against sales." *Id.* This dispute is a classic genuine issue of material fact. The VaR and Defendants' actions in light of the absence of fresh underlying cash activity does have some import into whether Defendants are engaging in hedging or speculating. The question is, how much weigh to give the testimony of the experts, Defendants' own contentions, and the various statistical measures of risk? This is a fact-intensive question that must be decided by a fact-finder. *See In re Ashanti Goldfields Securities Litig.*, 184 F. Supp. 2d 247, 260 (E.D.N.Y. 2002) ("Indeed, at least in the context of taxation, courts have held that the determination of whether futures activity is hedging or speculation is a factual issue, not a legal one."); *see also Sharette v. Credit Suisse Intern.*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015) ("[W]hether Plaintiffs' contentions as to the meaning of the term 'hedging' are correct is also a

question of fact to be adjudicated by the fact finder."). The Court cannot conclude, as a matter of

law, whether Defendants were engaged in bona fide hedging activity or speculation.[24]

    iii.   *Artificial Price*

"To successfully plead a manipulation claim, Plaintiffs must also allege an artificial price

of the relevant commodity—that is 'a price that does not reflect basic forces of supply and

demand.'" *Cotton I*, 2013 WL 9815198 at *17 (quoting *Parnon Energy, Inc.*, 875 F.Supp.2d at

246). "When determining if artificial prices exist, a court may consider the underlying

commodity's normal market forces, historical prices, supply and demand factors, price spreads,

and also the cash market for the commodity at issue." *In re Commodity Exch., Inc., Silver Futures

and Options Trading Litig.*, No. 11-MD-2213, 2012 WL 6700236, at *12 (S.D.N.Y. Dec. 21,

2012). However, "a statistically unusual high (or low) price will not on that basis alone be deemed

---

[24] Defendants also argue that "[t]here is no evidence that anyone at Defendants believed that shorts
could not deliver; to the contrary, the evidence shows that Defendants thought shorts *could*
deliver—but might be holding out for a better deal." Def. MSJ at 33. Defendants note that their
compliance with ICE directives further indicates that they did not have the requisite manipulative
intent. *Id.* at 34. Moreover, Defendants allege that "Plaintiffs have no contrary evidence regarding
Defendants' 'intent.'" *Id.* This, however, misconstrues the inquiry. Plaintiffs are allowed to piece
together circumstantial evidence to prove intent. *Matter of Abrams*, 1993 WL 140823, at *4
("Intent is a subjective factor and since it is impossible to discover an attempted manipulator's
state of mind, intent must of necessity be inferred from the objective facts and may, of course, be
inferred by a person's actions and the totality of the circumstances."). Indeed, as discussed above,
"[i]n the context of a squeeze, manipulative intent may be inferred 'where, once the congested
situation becomes known . . . the [defendant] exacerbates the situation by, for example,
intentionally decreasing the cash supply or increasing his long in the futures market." *CFTC v.
Parnon Energy Inc.*, 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012) (quoting *Indiana Farm*, 1982 WL
30249, at *10 n.12). Plaintiffs have successfully demonstrated that a reasonable jury could piece
together the circumstantial evidence of intent—including Defendants' alleged uneconomic
conduct and misstatements to ICE—to conclude that Defendants acted with "purpose or conscious
object" to manipulate prices. Though Defendants provide evidence supporting their potential
innocent intent—including an email from Anthony Tancredi (the former President of Defendant
Allenberg) and their compliance with ICE regulations—these disputes over intent are best left to
be decided by the trier of act.

artificial . . . . '[I]t is incumbent on the parties to explain or justify the relevance of such evidence." *DiPlacido*, 2008 WL 4831204, at *30 (quoting *Cox*, 1987 WL 106879, at *9); *see also In re Soybean Futures*, 892 F. Supp. At 1053 n.28 ("[A] price is said to be 'artificial' or 'distorted' if it does not reflect the market or economic forces of supply and demand operating upon it.") (citing *Sullivan*, 47 F.3d at 861–62). When determining if a price is artificial, courts must "search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market." *Indiana Farm Bureau*, 1982 WL 30249, at *4 n.2.

For the reasons discussed above, the Court admits Dr. Pirrong's event study testimony concerning artificial pricing. Specifically, Dr. Pirrong testified that "the May 2011 cotton futures price was artificial [i.e., above the competitive price] by 14-15 cents/lb. during April-May 2011" and that "the July cotton futures price was artificial by as much as 32 cents/lb. during June-July 2011." Pirrong Report at ¶235; 443. Though the Court admits Dr. Pirrong's testimony, it is not, as a matter of law or fact, crediting it to be true. Defendants contend, however, that "[e]ven if Dr. Pirrong's event studies were admitted . . . no reasonable jury could find that futures prices were artificially high, because unrefuted evidence demonstrates that Defendants were selling cash cotton at prices *higher* than futures during the relevant period." Def. MSJ at 35. Defendants rely on *Cox*, which noted that in *Indiana Farm Bureau*, the CFTF "expressed the view that historical price comparisons were (in that case) of less probative value than data from related contemporaneous markets, including the cash market for the underlying commodity." *Cox*, 1987 WL 106879, at *8. Defendants accordingly note that since a cash purchaser was "willing to pay more than the futures price during an ongoing state of backwardation," that "demonstrates that futures prices reflected 'economic forces of supply and demand,' *DiPlacido*, 2008 WL 4831204,

at *29, and thus "the futures price could not be artificially high." Def. MSJ at 35 (citation omitted).

As a threshold matter, *Cox* explicitly rejects the idea that prices in the cash market can be

dispositive of the artificiality inquiry: "Of course, such prices have general relevance to the inquiry.

At the same time, they are not dispositive in and of themselves." *Cox*, 1987 WL 106879, at *10.

Moreover, Defendants' transactions at higher prices in the cash market constitute only four out of

the 194 sales that Defendants made from March 1 to June 22, 2011. Pl. MSJ Opp. at 40.

Defendants respond that *Cox* credited "isolated and sporadic" cash transactions to refute

the argument "that there was a thin cash market." Def. MSJ Reply at 21; *Cox*, 1987 WL 106879,

at *11.  Defendants obfuscate the limited import of this language in *Cox*, which the *Cox* court uses

only to refute the argument about the thin cash market.  The CFTC in *Cox* repeatedly noted that

cash market transactions "may contribute to an understanding of the market equilibrium price,"

but are "not necessarily dispositive." *Cox*, 1987 WL 106879, at *11.  Indeed, *Cox* found error in

the ALJ ignoring the cash market prices but went on to note that, given the flaws in using the cash

market as a barometer for artificiality, the CFTC "prefer[s] to examine the broadest possible range

of relevant cash market transactions." *Cox*, 1987 WL 106879, at *10.  Using the broadest possible

range of relevant cash market transactions, Plaintiffs persuasively argue that only four out of the

numerous sales Defendants conducted in the cash market were at prices higher than the futures

market.

Moreover, Dr. Pirrong calculated that between March 31 and May 5, 2011, Defendants

"were selling cotton in the cash market at prices that were on average 27.5 cents per pound lower

than the May Contract price on the day of the cash sale." Pl. MSJ Opp. at 40; Pirrong Supplemental

Amended Report ¶18.  Defendants cite their own expert to argue that Dr. Pirrong's analysis was

"based on serious misrepresentations of the sales contracts upon which no reasonable jury could

rely." Def. MSJ Reply at 21; *see also* Report of Matthew A Evans, Ex. 3 at ¶¶69–71 (noting that Defendants were not in a position to dictate prices because there were other sellers also active, because they were selling their futures in a cash market with ample trading volume and many competing sales, and because they were selling pursuant to ICE monitoring).  However, these objections—namely, that Defendants could not dictate prices—do not undercut Dr. Pirrong's statistical analysis of the average difference between the prices that Defendants were selling their cotton on the cash market and the May Contract prices.  Defendants are welcome to introduce evidence regarding their four higher transactions in the cash market to rebut Dr. Pirrong's testimony at trial, but Plaintiffs have demonstrated that a reasonable jury could conclude that the price of cotton was artificially high during the relevant time periods.

Plaintiffs also point to a number of other indicators of an artificially high price, aside from Dr. Pirrong's event study.  None of these are dispositive; nor do Plaintiffs assert they are.  Instead, each adds to the constellation of evidence supporting the conclusion of Dr. Pirrong's event study that prices were artificially high for the relevant contract periods.  These include the fact that (1) cotton futures prices switched from a declining backwardation to record increasing backwardation, (2) the May-July spread reached record highs in a record short time, (3) there was substantial inversions in the May-July and July-December spread, and (4) the May and July futures prices diverged significantly from multiple different cash market prices.  As a reminder, backwardation refers to the market condition where the price for prompt-month cotton is higher than prices for later contracts.[25]  Accordingly to Plaintiffs, the backwardation during April 2011 "rose by the

---

[25] Judge Pauley provides a more detailed explanation of contango and backwardation that may provide helpful context to Plaintiffs' arguments:

> For most commodities, the price of a futures contract includes such carrying costs as storage, insurance, financing, and other expenses the producer incurs as the

greatest amount in the 1961–2014 period, but the flat price fell by the greatest amount observed during these years." Pirrong Report at ¶185(A); UMF ¶815.  Moreover, price of the May 2011 future rose historically and dramatically (by approximately 15 cents/lb.) from March 30 to mid-April, 2011; but then collapsed over the last two trading days of the May 2011 future (by approximately 12 cents/lb.).[26]  Pirrong Report ¶185.  Plaintiffs note that similar, record

---

commodity awaits delivery. Thus, typically, the further in the future the delivery date, the greater the purchase price of the futures contract. That relationship is known as "contango." See Virginia B. Morris and Kenneth M. Morris, Standard & Poor's Dictionary of Financial Terms 41 (2007); see also Barbara J. Etzel, Webster's New World Finance and Investment Dictionary 74 (2003) ("contango[:] A pricing situation in which the prices of futures contracts are higher the further out the maturities are. This is the normal pricing pattern because carrying charges such as storage, interest expense, and insurance have to be paid in order to hold onto a commodity.").

Near-term supply of crude oil is generally inelastic because supply in the near term does not increase even if prices rise significantly. Long-term supply, on the other hand, is elastic because it can usually increase to meet market prices. Thus, if there is a shortage or tightness in immediate supply, traders are willing to pay a higher premium for near-term supply relative to long-term supply. Such a market condition is the opposite of contango and is called "backwardation." See Jerry M. Rosenberg, Dictionary of Banking and Finance 41 (1982) ("backwardation: a basic pricing system in commodities futures trading. A price structure in which the nearer deliveries of a commodity cost more than contracts that are due to mature many months in the future. A backwardation price pattern occurs mainly because the demand for supplies in the near future is greater than demand for supplies at some distant time.").

*In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 48 (S.D.N.Y. 2012).

[26] Specifically, the May-June contract spread increased from 6.82 cents a pound on March 30, 2011 to 21.69 cents a pound on April 25, 2011. UMF ¶816.  Then, during the last two trading days of the May 2011 contract (May 5-6), the May-July spread price dropped from 21.68 cents to 8.24 cents. UMF ¶828.  To quantify how drastic this price increase was, Dr. Pirrong "calculated the maximum change in the May-July spread over all two week periods for each year from 1960 through 2014." Pirrong Report at ¶228.  He concluded that "[t]he spread change of 14.63 cents in the first half of April, 2011 dwarfs the next largest spread increase of 6.75 cents in 1995. It is almost exactly ten times as large as the average maximum two-week spread increase in the 1961-2014 period, and 14 times as large as the median maximum two-week spread increase." *Id.*  Dr. Pirrong calculated that the decline in prices was similarly historic.  To quantify how drastic the price decrease was, Dr. Pirrong "compare[d] it to the biggest declines in the May-July spread over

backwardations and price spreads occurred for the July-December spread, where the spread increased 141% (from 18.7 cents to 45.15 cents) from June 7, 2011 to June 23, 2011, UMF ¶970; and then fell from 43.48 cents to 22.68 cents on the last two trading days of the July 2011 contract, UMF ¶917.  Plaintiffs also note that the May and July futures prices diverged significantly from multiple different cash market prices, and as Dr. Pirrong testifies "the data show plainly that cash cotton prices were well below contemporaneous futures prices" for the May and July cotton futures contracts. Responsive Expert Report of Dr. Craig Pirrong, Exhibit 15 at ¶153.  The sudden, historic rise in backwardation and spreads in the May-July and July-December contracts, coupled with the divergence between the cash market and the futures market, is further evidence of price distortion and an artificial price. *See, e.g.*, *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 (S.D.N.Y. 1998) ("The courts look to a variety of factors in determining artificiality, such as historical price comparisons, an evaluation of supply and demand factors, comparison of spreads, and comparison to the cash market for the commodity at issue."); *In re Soybean Futures Litig.*, 892 F. Supp. at 1058 ("Plaintiffs' evidence of record inversions in the cash and futures markets, abnormal spreads in futures prices, and a 'de-linking' of cash and futures prices is sufficient to show that there is a genuine, material issue that cannot be resolved by summary judgment.").

Defendants respond that Plaintiffs' statistics regarding the spread and backwardation do not meaningfully account for the record volatility, significant demand, very low supply, or existing

---

two-day periods from 1961-2014." *Id.* at ¶232.  He concluded that "[t]he biggest decline in other years was 7.98 cents in 1995, which is only about 60 percent of the size of the decline on May 5-6, 2011. The average biggest two-day decline in the May-July spread in the years 1961-2014 was 1.09 cents, or about 8 percent the size of the decline on the last two days of trading of the May 2011 cotton futures contract." *Id.*  Additionally, Dr. Pirrong noted that, "[c]ontrolling for a variety of other variables, the May price collapsed by approximately 12 cents/lb. on these days. The t-statistics on this decline (which measure statistical significance) are astronomical. To put this result in perspective, this decline was a 37 standard deviation move: the stock market crash on Black Monday, 1987, was only a 20 standard deviation move." *Id.* at ¶185(C).

backwardation for the crop year 2010-2011. Def. MSJ Opp. at 19–20.  First, Plaintiffs do not argue, nor does this Court conclude, that the evidence presented by Plaintiffs is dispositive on the issue of artificial prices; instead, the Court concludes that piecing together the evidence provided by Plaintiffs, a reasonable jury could conclude that the prices were artificially high during the relevant contract periods.   Second, though Defendants may disagree with the methodology, Plaintffs' statistics do in fact account for the uniqueness of the 2010–2011 crop year. *See* Pirrong Report at ¶233 ("To take into account the possibility that 2011 was a unique year, I have performed the event studies using a control period regression restricted to December 15, 2010 through March 29, 2011. In this event study, using the July futures price and the smoothed cash price as the control variables, the May price was inflated by 14.39 cents/lb. on FND."); *see also id.* at ¶¶237–254 (calculating artificiality while controlling for cotton supplies, demand, and expectations); *id.* at ¶¶255–258 (calculating spread even controlling for the stocks-usage ratio).

In sum, Plaintiffs present expert testimony, along with a variety of economic factors—including a comparison of spreads and backwardation, and a comparison to the cash market—to support the conclusion that the price of cotton during the relevant contract periods did "not reflect the market or economic forces of supply and demand." *Cox*, 1987 WL 106879, at *8; *see id.* ("Proof of artificiality generally has focused on significant deviations from normal historical futures market patterns and from related contemporaneous markets.").  To the extent there remain disputes about the validity of the assumptions underlying Plaintiffs' data of the spreads, backwardation, or cash market prices, "[t]hese questions go only to the weight of the evidence . . . and cannot be resolved on a motion for summary judgment." *In re Soybean Futures Litigation*, 892 F. Supp. 1025, 1057.

      iv.   *Causation*

"The fourth element of a CEA market manipulation claim requires a plaintiff to allege that the defendant caused the artificial prices." *Wilson*, 2016 WL 7229056, at *13. "The causation element requires that a defendant be the proximate cause of the price artificiality." *Silver Futures and Options Trading*, 2012 WL 6700236, at *16; *cf. Cox*, 1987 WL 106879, at *12 ("If the multiple causes cannot be sorted out, or if the respondents are not one of the proximate causes, then the charge of manipulation cannot be sustained.").  "The Commission has concluded that there can be multiple causes of an artificial price," *DiPlacido*, 2008 WL 4831204, at *10, but that "[w]here these causes can be sorted out, and respondents are a "proximate" cause of the artificial price, a charge of manipulation can be sustained," *id.* (quoting *Cox*, 1987 WL 106879, at *12).  Finally, given the fact-intensive nature of the inquiry, "causation is generally a jury question." *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 10 CIV. 5762 (PAE), 2016 WL 3098842, at *14 (S.D.N.Y. June 1, 2016); *see also Redd v. New York Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012) ("Issues of causation . . . are questions of fact.").

Plaintiffs assert that, but for Defendants' manipulative market behavior, the backwardation in cotton futures prices would have continued to decline and the cash market prices would have converged with futures prices approaching settlement.  Plaintiffs base this assertion on the fact that several "well-recognized indicia" of causation are present in this case—including Defendants' internal predictions, the market switch from declining backwardation to increasing backwardation, the spreads increasing to record highs at the time Defendants added to their long positions, and the corresponding collapse of the spreads as Defendants offloaded their long positions. *See* Pl. MSJ Opp. at 41–42.  Thus, Plaintiffs argue, the "highly unusual price patters, which occurred while [Defendants] increased (and then decreased) their long futures positions "speak for themselves" *Id.* at 42–43 (quoting *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1169–70 (8th Cir. 1971)).  Plaintiffs'

also point to Dr. Pirrong's event study analysis that concluded that "(1) controlling for market-wide factors, highly anomalous prices existed during the Class Period that are consistent with a market power manipulation . . . ; (2) a search for other causes revealed no non-manipulative factors that could explain the anomalous prices during the Class Period . . . ; and (3) [Defendants'] actions are extremely inconsistent with a rational merchant seeking to obtain the best quality cotton at the lowest possible price." Pl. MSJ Opp. at 44–45.   As discussed above, Dr. Pirrong's causation analysis accounted for other developments and potential causes of the artificial prices, including news reports, global shifts in supply and demand for cotton, and the unique volatility of the cotton market during the 2010-2011 crop seasons, and concluded that these factors could not explain movements in prices during the Class Period.  After a thorough review of his methodology, the Court found Dr. Pirrong's analysis, which was based on standard economic models, to be both reliable and admissible. *See supra* at 46–51.

Defendants advance several arguments challenging Dr. Pirrong's causation analysis.  Most of these issues have been addressed in the Court's decision on Defendants' motion in limine to exclude the testimony of Dr. Pirrong, where the Court concluded that it will largely admit Dr. Pirrong's testimony with some limited exceptions.  The Court does not rehash its analysis here.[27] First, Defendants contend that Dr. Pirrong's causation theory is "premised on the notion that the manipulating party can build a massive long position *without* affecting the price." Def. MSJ at 36. Dr. Pirrong's theory does not, in fact, rely on Defendants building their long position without

---

[27] Indeed, Defendants acknowledge that their arguments against causation, particularly as they relate to Dr. Pirrong's testimony, are largely duplicative of their arguments in their *Daubert* motions. *See* Def. MSJ Reply at 22 ("Dr. Pirrong's event studies and theories regarding causation are inadmissible and unreliable for the reasons described in Defendants' *Daubert* motion"); *id.* ("As shown in Defendants' *Daubert* motion and reply brief, Dr. Pirrong's causal theory is incoherent and contradicted by the factual record.").

affecting prices.  Dr. Pirrong only testified that "the manipulator endeavors to have little impact on prices while accumulating his position" because "[i]f buying drives up prices as much as selling an equivalent amount drives them down, manipulation cannot be profitable." Pirrong Rebuttal Repoert (Exhibit 15) at 19–20.  Accordingly, demonstrating that Defendants built up their long positions without affecting price is not essential to his analysis or conclusions.  Second, Defendants assert that "[a]nother keystone of Dr. Pirrong's theory of manipulation is his assertion that shorts drive market prices to artificial levels after they perceive a 'threat' of a corner through observing 'excess' open interest," but that he provides no evidence of reliance and that there is no relationship between excess open interest and artificiality.  These same arguments were discussed extensively and rejected by the Court in considering Defendants' motions in limine. *See supra* at 44–47.  Finally, Defendants assert that Dr. Pirrong did not account for the regulatory oversight of ICE in his causation analysis.   Again, this argument was addressed, and rejected, by the Court in considering Defendants' motion in limine. *See supra* at 48–49.

Defendants also object to Plaintiffs' "well-recognized" indicia of causation because the same indicia—including the declining backwardation and record spreads—were advanced to support Plaintiffs' arguments about artificial pricing and are insufficient. Def. MSJ Reply at 22 ("[Plaintiffs] merely repeat the same facts they described as 'indicia of artificial pricing,' which are not indicia of causation for the same reason they are not indicia of artificially pricing."). Despite Defendants' objections to these indicia (discussed above), the Court noted that Plaintiffs' indicators of an artificially high price, though not dispositive, should be admitted because they add to the constellation of evidence supporting the conclusion that prices were artificially high for the relevant contract periods. *See supra* at 77.  Defendants cite no cases to support the proposition that market indicators—and testimony about the interplay between these indicators and a defendants'

conduct—cannot be used to both support the artificiality prong and the causation prong of the CEA analysis.  Again, the Court does not conclude that these indicators are dispositive of causation. Moreover, Defendants are free to challenge the weight given to these indicators by the fact-finder at trial.  However, the Court concludes that in light of these indicators and Dr. Pirrong's causation analysis, a reasonable jury could conclude that Defendants were the proximate cause of the artificial prices in the cotton futures market during the relevant May and July 2011 contract periods.

### B.  CEA Aiding and Abetting Claim

Plaintiffs second claim alleges that Defendants' willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by other Defendants and unknown affiliates and associates. *See* 7 U.S.C. § 25(a)(1).  "[A]iding and abetting requires the defendant to 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 180–81 (2d Cir. 2013) (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir.1938) (Hand, J.)).  In *Cotton I*, this Court concluded that "Plaintiffs have supplied facts from which the Court can plausibly infer the corporate Defendants knew of Defendant Nicosia's intent to manipulate cotton futures prices and aided and abetted him in that activity." *Cotton I*, 2013 WL 9815198 at *20.

Defendants do not challenge Plaintiffs' CEA aiding and abetting claim directly.  Instead, Defendants only note that "[b]ecause Plaintiffs' CEA claims should be dismissed, its aiding and abetting claim must be dismissed as well." Def MSJ at 19.  Defendants are correct to assert that, if the Court dismissed Plaintiffs' CEA claim, then it would also have to dismiss the aiding and abetting claims. *See CFTC v. Wilson*, 2018 WL 6322024, at *21 (S.D.N.Y. Nov. 30, 2018) ("The

CFTC's failure to prove either market manipulation or attempted market manipulation also compels dismissal of its . . . aiding and abetting claims against [defendant], as these claims require an underlying violation.").  However, for the reasons discussed above, the Court does not dismiss Plaintiffs' CEA claims.  Accordingly, Defendants provide no reason for the Court to dismiss Plaintiffs' aiding and abetting claims, and the Court declines to dismiss them.

### C.  **Sherman Act §2 Antitrust Claim**

Plaintiffs final claim is for antitrust violations under the Sherman Act. 15 U.S.C. §2 (2013). In *Cotton I*, this Court concluded that Plaintiffs plausibly stated a cause of action for Defendants' alleged violations of § 2 of the Sherman Act.  Specifically, the Court noted that Plaintiffs plausibly alleged that Defendants possessed monopoly power "in the cotton futures market" because Defendants "had the ability to control the settlement price;" and that Defendants "intentionally created artificial prices through their uneconomic conduct." *Cotton I*, 2013 WL 9815198, at *23. For the reasons set forth below, a reasonable jury could render a verdict in Plaintiffs' favor for this claim, and accordingly this claim survives Defendants' summary judgment motion.

"[T]o state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  Inherent to the second element, there must be a showing of anticompetitive conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.") (emphasis in

original).  "In the context of antitrust cases . . . summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces." *PepsiCo, Inc.*, 315 F.3d at 104 (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998)).

     i.   **Possession of Monopoly Power**

 "There are two ways a plaintiff can show the possession of monopoly power: (1) through direct evidence of anticompetitive effects or (2) by defining a relevant market and showing defendants' excess market share." *In re Crude Oil Commodity Futures Litig.*, 913 F.Supp.2d 41, 51 (S.D.N.Y.2012) (citing *PepsiCo.*, 315 F.3d at 107); see also *Grinnell*, 384 U.S. at 571 ("The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market.").  "A court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics." *Tops Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998).  Other relevant market characteristics include "the 'strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand.'" *Id.* (citation omitted).

    Plaintiffs present sufficient direct evidence of monopoly power.  "Monopoly power, also referred to as market power, is the power to control prices or exclude competition." *Id.* (quotation omitted).  The Court discusses, in detail, Defendants' ability to influence market prices above. *See supra* Section II(A)(i).  To summarize, Plaintiffs allege that Defendants, knowing that the market for certificated cotton supply was congested, continued to acquire dominant long positions, insisted upon record ratios of deliveries, depleted certificated cotton, and refused to retender; all allowing them to dictate prices of cotton knowing that it would be impossible for Plaintiffs to certificate more cotton in time for delivery. *See id.*  The Court found this argument—along with

the underlying evidence and testimony presented by Plaintiffs' experts—sufficient to find that a reasonable jury could conclude that Defendants' had the ability to influence market prices.

Plaintiffs also point to the record backwardation to further support the claim the Defendants had the power to control prices. *See* Pl. MSJ Opp. at 50 n.42 ("Through their enormous late buying, [Defendants] intentionally amassed a long position which was greater than deliverable supply, causing the market to execute a "U-turn" in backwardation and resulting in "the highest percentage of backwardation and the highest absolute backwardation of any May-July Contract in the history of cotton futures trading for the time period of April 1-May 6 for each year from 2000-2011.") (quoting *Cotton I*, 2013 WL 9815198 at *24); *see also* Pirrong Report ¶185 ("[D]uring April, 2011, backwardation rose by the greatest amount in the 1961-2014 period, but the flat price fell by the greatest amount observed during these years."). This evidence of a U-turn in backwardation further supports the conclusion that Defendants could control market prices. *See In re Crude Oil*, 913 F. Supp. 2d at 51 ("Defendants' ability to change the market from backwardation to contango is . . . a direct measure of control and demonstrates ability to influence the market.") (quotation omitted). As the Court concluded in *Cotton I*, and with the benefit of additional discovery, expert testimony, and a factual record, Plaintiffs sufficiently "detail how Defendants allegedly effectuated a squeeze in the cotton futures market, which in turn allowed Defendants to artificially manipulate futures prices during the May and July 2011 Contracts." *Cotton I*, 2013 WL 9815198, at *24.

Defendants argue that Plaintiffs have not properly or sufficiently defined the relevant market for purposes of demonstrating monopoly power. However, it is well-settled law in this Circuit that "pleading a defendant's direct control over prices is an alternative to pleading relevant market share." *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 141 (S.D.N.Y. 2016); *see also PepsiCo*, 315 F.3d at 107 ("[T]here is authority to support [the] claim that a

relevant market definition is not a necessary component of a monopolization claim."); *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir.2004) ("Monopoly power . . . can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market."). "[B]ecause Plaintiffs have pleaded the possession of monopoly power through [defendant's] ability to control prices, an inadequate relevant market definition is not fatal to Plaintiffs' section 2 claims." *In re Crude Oil*, 913 F. Supp. 2d at 53. Similarly, here the Court declines to address the Parties' disputes about whether Plaintiffs have adequately defined the relevant market given the persuasive evidence that Defendants' ability to control prices.[28] Moreover, Plaintiffs do allege claims "with reference to a particular market," *Heerwagen v. Clear Channel Commun.*, 435 F.3d 219, 229 (2d Cir. 2006)—namely "the long position in the expiring ICE cotton futures contract or the market for taking deliveries on such Contract [f]rom March 30 until the end of May 2011 . . . [and f]rom June 7 until the end of July 2011[.]" TCAC ¶¶ 106–107.

    ii.    **Willful Acquisition or Maintenance of Power**

---

[28] Defendants note that Plaintiffs provide no formal analysis of the relevant market, and that instead, Plaintiffs point to a statement from Dr. Pirrong made in his expert report in regards to Plaintiffs' CEA claims, not their Sherman Act claims: "For the purpose of determining market power, deliverable supply also defines the relevant market. That is, with respect to Defendants' 'largest ever position' in the ICE [] cotton futures market, the relevant market for determining whether any party has market power is the market for tenderable, uncommitted cotton in ICE warehouses." Pirrong Report at ¶96; *see* Pl. MSJ Opp. at 47. Defendants note that this market definition was made in the context of Plaintiffs' CEA claims, not their Sherman Act claims, and that the definition differs from the relevant market provided in the Third Consolidated Amended Complaint (moving from a relevant market consisting of *futures contracts* to one of *deliverable supply*) without providing a justification or support for the change. However, for the reasons discussed above, the Court does not need to conclude whether the relevant market defined by Plaintiffs' is sufficient to demonstrate monopoly power, because Plaintiffs have demonstrated such power through direct evidence of Defendants' power to control prices. Moreover, the "market definition is a deeply fact-intensive inquiry," and to the extent Defendants contest the sufficiency of Plaintiffs' experts' definition of a relevant market, resolution of that contest should be left to a finder of fact rather than this Court.

The second element of a Sherman Act §2 claim is demonstrating "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo*, 315 F.3d at 105 (quoting *Grinnell Corp.*, 384 U.S. at 570–571). As noted above, as part of this element, Plaintiffs must show anticompetitive conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.") (emphasis in original). The Second Circuit has defined anticompetitive conduct as "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir.2014).

Defendants assert that "[t]he only purported anticompetitive conduct mentioned in the Complaint is that Defendants 'uneconomically overpa[id] for cotton and forc[ed] deliveries . . . that could have been satisfied much more cheaply in the [physical] market." Def. MSJ at 41 (quoting TCAC ¶109). As this Court noted in *Cotton I*, Plaintiffs plead a plausible, if not strong, case for uneconomic conduct, which is now supported by expert testimony and a factual record. Plaintiffs plausibly allege that Defendants' conduct—of acquiring large long positions and continuing to add to them, holding these positions while the rest of the market liquidated, insisting on record ratios of deliveries, depleting certificated supplies of cotton, turning down cheaper cotton in the cash market and overpaying for cotton in the futures market—was taken for the purpose of undermining competition and has no legitimate business purpose. *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 143 (S.D.N.Y. 2016) ("Court need not infer Barclays's motive for engaging in money-losing daily contract transactions, however, because Merced has included facts in its Complaint that plainly suggest Barclays's conduct was intended to artificially

inflate or deflate market prices and constrain the market for other buyers and sellers of electricity."). A reasonable jury could conclude that Defendants' conduct was taken to unilaterally force prices upwards for anticompetitive purposes in violation of §2 of the Sherman Act.

D. **Standing to Assert July Contract Claims**

Defendants raise, for the third time, an argument challenging Plaintiffs' standing to assert claims for the July 2011 Contract. Specifically, Defendants assert that neither of the named Plaintiffs in this case—Mr. Allen and Mr. Ledwith—have standing because neither has damages in the July 2011 Contracts. This argument has been previously rejected by both Magistrate Judge Fox, *see In re Term Commodities Cotton Futures Litig.*, 12-CV-5126, 2018 WL 1737706, at *8–9 (S.D.N.Y. Feb. 28, 2018), and myself, *see In re Term Commodities Cotton Futures Litig.*, 371 F. Supp. 3d 95, 100 (S.D.N.Y. 2019). Nevertheless, the Court briefly addresses this argument again, and rejects it again.

To have Article III standing, a plaintiff "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). Section 22 of the CEA regulates futures trading and creates a private right of action for private plaintiffs meeting the requirements set forth within. *See* 7 U.S.C. § 25(a)(1). Section 25(a)(1) states, in part:

> Any person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for *actual damages* resulting from one or more of the transactions referred to in subparagraphs (A) through (D)

*Id.* (emphasis added); *see Klein & Co. Futures, Inc. v. Board of Trade of City of New York*, 464 F.3d 255, 259–60 (2d Cir. 2006). "[D]istrict courts in this Circuit have consistently held that the fact that Section [25] limits a defendant's liability to actual damages compels a plaintiff to plead

86

actual injury caused by the violation . . . ." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018) (collecting cases) (internal citations omitted).  Furthermore, courts have determined that the actual injury analysis is comparable to that of the injury in fact analysis utilized to determine constitutional standing.  *See id.* at 111–12 (citing *In re Commodity Exchange, Inc.*, 213 F.Supp.3d 631, 650 (S.D.N.Y. 2016).  If a plaintiff is to successfully plead actual injury stemming from a defendant's market manipulations, she must satisfy two requirements. *Total Gas*, 889 F.3d at 111.  First, she must plausibly allege "that she transacted in at least one commodity contract at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations." *Id.*  Second, she must plausibly allege that the manipulated prices were detrimental to her. *Id.*  The facts alleged in a complaint "can be quite general statements about the nature of the instruments they are trading and the institutional contexts in which those trades take place." *Id.* at 112.  For example, if a complaint alleges that a plaintiff "traded and lost money . . . during a bout  of defendant's alleged market manipulation in the same contract type in the same exchange for delivery at the same time and place," her pleading is likely to be sufficient. *Id.*

Defendants assert that neither Allen nor Ledwith have damages in the July Contract.  Specifically, Defendants allege that Allen did not trade in the July Contract and that, although Ledwith purchased fifty-seven July 2011 Contracts, he closed out his position in the July Contract on June 14, 2011, "three days *before* the first date that Dr. Pirrong identified statistically significant price artificiality." Def MSJ at 43.  Defendants go on to note that "Dr. Pirrong acknowledges 'the absence of net artificial impact' of an alleged manipulation of the July Contract on Mr. Ledwith." *Id.* (quoting Exhibit 19 ¶5).[29]  Defendants previously raised similar arguments in opposition to

---

[29] In that very same paragraph, however, Dr. Pirrong states: "In my opinion, Ledwith has an incentive to prove these facts. This is because the allegations relating to the July contract are sometimes exactly the same and almost always substantially similar to the allegations relating to

Plaintiffs' motion to amend and in a motion for judgment on the pleadings. *See Cotton II*, 2018 WL 1737706, at *7 (noting Defendants argument that "since Ledwith cannot demonstrate that he traded in the July Contract on or after June 17, 2011, he cannot demonstrate standing to sue under either Article III or the CEA; therefore, the proposed amendment would be futile."); *Cotton III*, 371 F. Supp. 3d at 100 ("In the instant Motion, Defendants seek to dismiss Plaintiff's claims regarding the July 2011 Contract arguing that Ledwith has failed to satisfy the CEA pleading standard, thus rendering Plaintiffs without a proper class Plaintiff for the July 2011 Contract.").

In considering Defendants' claim, Judge Fox analogized to the theory of "persistent suppression" alleged in both *LIBOR* and *In re Platinum*.  "In evaluating the persistent suppression allegations in plaintiffs' first amended complaint, we did not require plaintiffs to allege the specific days on which they traded because LIBOR, and consequently Eurodollar futures prices, was allegedly artificial throughout the Class Period." *LIBOR*, 962 F. Supp. 2d at 621–622.  Similarly, in *In re Platinum*, the defendants argued that plaintiffs "do not have standing under the CEA because [p]laintiffs have not alleged that they sold Platinum and Palladium Investments during time periods when prices were allegedly suppressed." *In re Platinum*, 2017 WL 1169626, at *28. The *Platinum* court applied the "persistent suppression theory" to conclude that, because plaintiffs in that case "allege that the platinum and palladium Fix Prices were artificially low throughout the Class Period as a result of Defendants' ongoing manipulation scheme," plaintiffs "have adequately alleged that they suffered actual damages as a result of Defendants' price manipulation." *Id.* at *29.  Extending the logic of *Platinum* and *LIBOR* to this case, Judge Fox concluded that Plaintiffs in this case are "alleging ongoing manipulation through a series of uneconomic acts and, thus, can

---

the May contract. Multiple facts to be proved assist in establishing manipulative intent, artificial impact on prices, causation and ability to influence prices for both the May and July contract." Exhibit 19 ¶5.

be said to have alleged actual damages, adequately, to establish standing under the CEA." *Cotton II*, 2018 WL 1737706 at *9. This Court similarly concluded that "[t]he factual allegations in the TAC sufficiently allege that Ledwith 'traded and lost money during defendants' alleged market manipulation' of the July 2011 Contract." *Cotton III*, 371 F. Supp. 3d at 100 (quoting *Total Gas*, 889 F.3d at 112).

The record developed during discovery supports application of the "persistent suppression theory" to the named Plaintiffs' claims. During the Class Period, Allen liquidated short positions in the May Contract and long positions in the July Contract; and Ledwith liquidated short positions in both the May and July Contracts. Pl. MSJ Opp. at 54. Plaintiffs estimate that Allen's transactions resulted in net artificiality paid of $15,639.70 and Ledwith's transactions resulted in net artificiality paid of $56,062. *See id*; *see also* UMF ¶918–919. Defendants provide no arguments in opposition to the Court's "persistent suppression theory," aside from arguments regarding class standing for the July Contract. The Court concludes that the "persistent suppression theory" applies to Plaintiffs claims, and thus that they sufficiently allege an actual injury under both Article III and the CEA. *See In re Amaranth*, 269 F.R.D. at 380 ("Plaintiffs have also demonstrated actual injury under the CEA by a preponderance of the evidence. . . . [C]ase law suggests that because plaintiffs transacted at artificial prices, injury may be presumed.").

Finally, Defendants put forth arguments about why neither Allen nor Ledwith has "class standing" for the July Contract. *See* MSJ at 44–50. As Defendants acknowledge, "[t]his case is unique in that summary judgment precedes class certification," and that generally courts address class standing at either the motion to dismiss or class certification stages of litigation. *Id.* at 44 n.20. Defendants point to no cases where a court has considered standing in a class action at summary judgment. "[A]s the Supreme Court has explained, it is appropriate to defer standing

objections until after class certification where certification issues are 'logically antecedent to Article III concerns." *Clarizia v. Ocwen Fin. Corp.*, 13-CV-2907 (ALC) (HBP), 2016 WL 439018, at *8 (S.D.N.Y. Feb. 2, 2016) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)). Therefore, "courts may 'treat class certification as logically antecedent to standing where class certification is the source of the potential standing problems.'" *Id.* (citation omitted).   Here, Defendants objections to "class standing" for the July 2011 are intricately intertwined with arguments about class certification.   Accordingly, the Court declines to address Defendants' arguments regarding class standing at this time, though Defendants are free to raise these issues when Plaintiffs move for class certification.

## CONCLUSION

In a case as complex, and with as much at stake, as this one, it is inevitable that the Parties will have significant disputes.   The question for the Court today is whether Defendants have demonstrated, as a matter of law, that Plaintiffs' claims must fail.   They have not.   For the reasons set forth above, Defendants' motion for summary judgment is denied.   The Parties should submit a joint status report indicating how they would like to proceed within 30 days of the filing of this Opinion & Order.

**SO ORDERED.**

**Dated:   September 30, 2020**
**New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**